Gary EHRLICH and Maryanne
Ehrlich, Plaintiffs–
Appellants,

v.

AMERICAN AIRLINES, INC., Ameri-
can Eagle Airlines, Inc. and Simmons
Airlines, Inc., Defendants–Appellees.

Docket No. 02–9462.

United States Court of Appeals,
Second Circuit.

Argued Aug. 25, 2003.

Decided March 8, 2004.

Frank H. Granito, Jr., New York City (Jeanne M. O'Grady, Speiser, Krause, Nolan & Granito, New York City, of counsel), for Appellants.

David S. Rutherford, New York City (Lewis R. Silverman, Sarah A. Hine, Rutherford & Christie, New York City, of counsel), for Appellees.

Robert M. Loeb, Civil Division, Department of Justice, Washington, DC (Peter D. Keisler, Assistant Attorney General, Roslynn R. Mauskopf, United States Attorney, Colette G. Matzzie, Attorney, Civil Division, Department of Justice, Washington, DC, of counsel), for The United States as Amicus Curiae.

Before: MESKILL, MINER and STRAUB, Circuit Judges.

MESKILL, Circuit Judge.

Plaintiffs-appellants Gary and Maryanne Ehrlich (the Ehrlichs) experienced an ordeal that few airline passengers have the misfortune to endure. While traveling from Baltimore, Maryland to John F. Kennedy International Airport (JFK) to catch a connecting flight to London, the Ehrlichs' plane suffered an abnormal landing. On approaching JFK, their aircraft overshot the runway and was abruptly stopped by an arrestor bed before the plane would otherwise have plunged into the waters of nearby Thurston Bay.[1]

According to the Ehrlichs, both appellants sustained physical and mental injuries during the course of that incident. They subsequently commenced an action to recover damages for those injuries pursuant to the international treaty commonly known as the Warsaw Convention. *See* Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, 3014, T.S. No. 876 (entered into force in the United States in 1934) (Warsaw Convention), *reprinted in* 49 U.S.C. § 40105 note.

Defendants-appellees American Airlines, Inc. (American Airlines), American Eagle Airlines, Inc. (American Eagle), and Simmons Airlines, Inc. (Simmons Airlines)

---

1. *See Arrestor Bed Saves The Day At JFK,* Intercom (Federal Aviation Administration William J. Hughes Technical Center, Atlantic City International Airport, N.J.), May 1999, at 1, *available at http://www.tc.faa.gov/intercom/may99.pdf* ("On Saturday, May 8, [1999,] at JFK International Airport, a soft ground arrestor system developed by the Federal Aviation Administration safely stopped an American Eagle Saab 340, carrying 27 passengers and 3 crew, from possibly plunging off the end of the runway into Thurston Bay."); *see also* Federal Aviation Administration, Office of Aviation Research, FAA R & D Factsheet at 1, *at http://research.faa.gov/aar/docs/EMAS-fact.pdf* (last visited Mar. 4, 2004) (FAA R & D Factsheet) ("[On May 8, 1999], an American Eagle flight ran out of runway while trying to land at John F. Kennedy International Airport (JFK). The Saab 340 commuter aircraft overshot the runway, stopping 248 feet into the 400–foot long arrestor bed, only 200 feet from the waters of Thurston Bay.").

(collectively the airline defendants) moved for partial summary judgment. The United States District Court for the Eastern District of New York, Amon, *J.*, granted their motion on the ground that they could not be held liable under the Warsaw Convention for mental injuries that were not caused by physical injuries. *See Ehrlich v. American Airlines*, 2002 U.S. Dist. LEXIS 21419, at *10–*11 (E.D.N.Y. June 21, 2002).

This appeal asks us to resolve whether passengers can hold carriers liable in accordance with the Warsaw Convention for mental injuries that accompany, but are not caused by, bodily injuries. For the reasons that follow, we hold that they may not and affirm the district court's grant of partial summary judgment.

## BACKGROUND

On May 8, 1999, Gary and Maryanne Ehrlich boarded American Eagle Flight No. 4925 in Baltimore, Maryland. They intended to travel to JFK, where they were scheduled to connect to an American Airlines flight to London. When their flight reached JFK, the plane approached the airport at a high rate of speed, overshot its designated runway, and was abruptly stopped from potentially plunging into Thurston Bay by an arrestor bed.[2] The passengers subsequently evacuated that aircraft by jumping approximately six to eight feet from its doorway.

The Ehrlichs contend that they suffered bodily injuries during the course of both the abnormal landing and the ensuing evacuation. Gary Ehrlich allegedly sustained knee injuries, while Maryanne Ehrlich purportedly sustained injuries to, *inter alia*, her neck, back, shoulder, hips, and right knee. Since the abnormal landing, Maryanne Ehrlich has also allegedly developed hypertension and a heart problem.

In addition to these bodily injuries, the Ehrlichs further contend that they sustained mental injuries. According to the evidence presented to the district court, both Gary and Maryanne Ehrlich suffered from a fear of flying after the accident. Moreover, Gary Ehrlich apparently experienced nightmares after which he awoke in the middle of the night recalling the abnormal landing and evacuation. Similarly, Maryanne Ehrlich reports that she periodically has trouble sleeping as a result of the accident.

On September 27, 1999, the Ehrlichs commenced the instant action against American Airlines, American Eagle, and Simmons Airlines in the United States District Court for the Eastern District of New York, pursuant to the Warsaw Convention, in an effort to recover damages for their aforementioned physical and psychological injuries. After deposing the Ehrlichs, the airline defendants moved for partial summary judgment. They asked the district court to dismiss the Ehrlichs' claims for mental injuries on two grounds. First, the airline defendants argued that

---

2. The arrestor bed at JFK is an Engineered Materials Arresting System (EMAS). *See* The Port Authority of New York and New Jersey, Airport Information & Facts, at 4, *at* http://www.panynj.gov/aviation/jfk_fact_sheet.pdf (last visited Mar. 4, 2004) (describing, *inter alia*, JFK's arrestor bed). These systems are designed to stop an aircraft that overruns the end of a runway "by exerting predictable deceleration forces on its landing

gear as the EMAS material crushes." Federal Aviation Administration, Advisory Circular No. 150/5220–22, Engineered Materials Arresting Systems (EMAS) for Aircraft Overruns, at ¶ 6(a) (Aug. 21, 1998), *available at* http://www.faa.gov/arp/pdf/5220–22.pdf. In scientific shorthand, an EMAS is made of water, foam, and cement, and deforms under the weight of an aircraft tire; as the tire crushes the material, the drag forces decelerate the

the Ehrlichs had failed to prove that they had sustained such injuries. Second, the airline defendants contended that, even if the Ehrlichs had suffered those injuries, the damages in question did not flow from their bodily injuries and that carriers were liable under the Warsaw Convention only for psychological injuries that were caused by bodily injuries.

The Ehrlichs vigorously opposed that motion. They argued that they had, in fact, sustained mental injuries. They also took the position that carriers could be held liable under the Warsaw Convention as long as a mental injury accompanied a physical injury, regardless of whether the two distinct types of injuries shared a causal relationship. Finally, although they never filed a formal cross-motion for partial summary judgment with respect to the matter, the Ehrlichs asked the court to grant them partial summary judgment on the issue of carrier liability. In essence, the Ehrlichs argued that, under the International Air Transport Association Intercarrier Agreement on Passenger Liability (Intercarrier Agreement),[3] the airline defendants were strictly liable for damages up to the equivalent of $140,000 and that the airlines bore the burden of proving that they had taken all necessary measures to avoid damages sustained in excess of that sum.

The district court heard oral argument on May 31, 2001, at which time the court granted the Ehrlichs' so-called "cross-motion" for partial summary judgment on the issue of liability under the Intercarrier Agreement. *Ehrlich*, 2002 U.S. Dist. LEXIS 21419, at *3. However, the court initially reserved decision on the airline defendants' motion for partial summary judgment. In June 2002, after further

considering the issue, the district court granted partial summary judgment in favor of the airline defendants. *See id.* at *1.

On reviewing the applicable case law, the court determined that, "[u]nder the Warsaw Convention, a plaintiff may only recover for emotional damages caused by physical injuries." *Id.* at *10. This proved to be a critical conclusion, as the court found that the Ehrlichs had offered no evidence demonstrating a causal connection between their mental and physical injuries. *Id.* at *10–*11. Because the district court concluded that the Ehrlichs had "not raised a genuine issue of fact regarding a causal connection between their alleged bodily injuries and their mental suffering," the court granted the airline defendants' motion for partial summary judgment, holding that the Ehrlichs could "not recover for their emotional trauma resulting solely from the aberrant landing and evacuation." *Id.* at *11.

Shortly thereafter, the Ehrlichs sought to certify the issue for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The district court denied their motion and set a trial date for the remaining Warsaw Convention issues pertaining to liability for bodily injuries. However, the parties managed to resolve those issues before trial. On October 31, 2002, the Ehrlichs stipulated to the discontinuance of their action with prejudice against American Airlines and Simmons Airlines. At the same time, American Eagle filed an Offer of Judgment in which it presented the Ehrlichs with the opportunity to take a judgment in the amount of $100,000 against that airline. Several days later, the Ehrlichs accepted American Eagle's offer on the condition that their acceptance

---

aircraft, bringing it to a stop. *See* FAA R & D Factsheet, *supra* note, at 1.

**3.** *See* International Air Transport Association Intercarrier Agreement on Passenger Liabili-

ty, Oct. 31, 1995, *reprinted in* Lawrence B. Goldhirsch, *The Warsaw Convention Annotated: A Legal Handbook* 577–78 (Kluwer Law International 2000) (1988).

was "without prejudice to plaintiffs' right to appeal from" the order of partial summary judgment.

The district court issued a Judgment that conformed to both American Eagle's offer and the Ehrlichs' conditional acceptance thereof. The court entered a judgment in the amount of $100,000 against American Eagle in complete satisfaction of the Ehrlichs' claims for bodily injury. The court also entered a judgment in favor of the airline defendants pursuant to its earlier order granting their motion for partial summary judgment with respect to the Ehrlichs' claims for mental injuries; the judgment entered by the district court was expressly without prejudice to the Ehrlichs' right to appeal from that partial summary judgment decision. This timely appeal followed.

## DISCUSSION

### I. Standard of Review

 We review *de novo* the district court's grant of a motion for partial summary judgment, *Juliano v. Health Maintenance Org. of New Jersey*, 221 F.3d 279, 286 (2d Cir.2000), but we only undertake to do so when, as here, a final decision has rendered the case appealable. *See Travelers Ins. Co. v. Carpenter*, 313 F.3d 97, 102 (2d Cir.2002). Similarly, "[t]he proper interpretation of the Warsaw Convention is an issue of law, which we review *de novo*." *Wallace v. Korean Air*, 214 F.3d 293, 296 (2d Cir.2000).

### II. The Warsaw Convention System

The Ehrlichs seek to hold American Eagle liable for their mental injuries pursuant to the Warsaw Convention. As we exhaustively explained more than a decade ago,

> [t]he Warsaw Convention was drafted when the airline industry was in its infancy. It was the product of two international conferences—the first held in Paris in 1925 and the second in Warsaw in 1929—and four years of work by the interim Commité International Technique d'Experts Juridique Aériens (CITEJA) formed at the Paris Conference. The Convention had two primary goals: first, to establish uniformity in the aviation industry with regard to "the procedure for dealing with claims arising out of international transportation and the substantive law applicable to such claims," as well as with regard to documentation such as tickets and waybills; second—clearly the overriding purpose—to limit air carriers' potential liability in the event of accidents.

*In re Air Disaster at Lockerbie, Scotland on December 21, 1988*, 928 F.2d 1267, 1270 (2d Cir.1991) (*Lockerbie*) (internal citations omitted). Over time, the Warsaw Convention fostered a system of liability consisting of a series of laws, treaties, and individual contracts that governs the international transportation of persons, baggage, and goods by air. *See Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir.2001); *Wallace*, 214 F.3d at 296. Article 17 of the Warsaw Convention itself sets forth the conditions pursuant to which an air carrier "can be held liable for injuries to its passengers." *Sulewski v. Federal Express Corp.*, 933 F.2d 180, 180 (2d Cir.1991). If a passenger's injuries fall within the scope of Article 17, he "is either entitled to recovery under the Convention or not at all." *Magan v. Lufthansa German Airlines*, 339 F.3d 158, 161 (2d Cir. 2003).

The Ehrlichs contend that, under Article 17, passengers may hold carriers liable for their mental injuries whenever they sustain physical injuries regardless of whether their psychological damages were caused by bodily injuries. However, these

arguments implicate not only the Warsaw Convention itself but also the most recent addition to its derivative liability regime, namely the treaty commonly referred to as the Montreal Convention, *see* Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999 (entered into force on Nov. 4, 2003) (Montreal Convention), *reprinted in* S.

Treaty Doc. No. 106–45, 1999 WL 33292734 (2000), and, to a more significant extent, the negotiations that led to the adoption of that treaty.[4]

■ In the proceedings below, the Ehrlichs sought to support their interpretation of Article 17 by relying, in no small measure, on the views expressed by various

4. The Montreal Convention is the product of an effort by the International Civil Aviation Organization, a specialized agency of the United Nations, to reform the Warsaw Convention so as to "harmonize the hodgepodge of supplementary amendments and intercarrier agreements" of which the Warsaw Convention system of liability consists. Carl E. Fumarola, Note, *Stratospheric Recovery: Recent And Forthcoming Changes In International Air Disaster Law And Its Effect On Air Terrorism Recovery*, 36 Suffolk U.L.Rev. 821, 835 (2003). In May 1999, the agency convened an international conference in Montreal, Canada; nations gathered at that conference to negotiate and adopt a new treaty that would replace the Warsaw Convention. *See* Blanca I. Rodriguez, *Recent Developments In Aviation Liability Law*, 66 J. Air L. & Com. 21, 25–26 (2000). More than 500 delegates, representing 121 states, attended the conference in Montreal from May 10, 1999, until May 28, 1999. *See* 1 Charles F. Krause & Kent C. Krause, *Aviation Tort And Regulatory Law* §§ 11:13, 11:14, at 11–51 to 11–52 (2d ed.2002). On the last day of the conference, the delegates approved a new Convention for the Unification of Certain Rules for International Carriage by Air, which has come to be known as the Montreal Convention. *See* Rodriguez, *supra*, at 26. Fifty-two countries, including the United States, immediately signed the treaty. *See* Letter of Submittal of Strobe Talbott (June 23, 2000) (Talbott Letter), *reprinted in* S. Treaty Doc. No. 106–45, 1999 WL 33292734.

The Montreal Convention is not an amendment to the Warsaw Convention. *See Schopenhauer v. Compagnie Nationale Air France*, 255 F.Supp.2d 81, 87 (E.D.N.Y.2003); *see also*, Rodriguez, *supra*, at 26. Rather, the Montreal Convention is an entirely new treaty that unifies and replaces the system of liability that derives from the Warsaw Convention. *See Schopenhauer*, 255 F.Supp.2d at 87; *see also* J.C. Batra, *Modernization Of The Warsaw System—Montreal 1999*, 65 J. Air. L. & Com.

429, 433 (2000) ("The [Montreal Convention] ... is a new, comprehensive international treaty of private international air law that replaces the seventy year old Warsaw Convention."); Talbott Letter, *supra*, at 1999 WL 33292734 ("Upon entry into force, the [Montreal] Convention will take precedence over the Warsaw Convention and any of its amendments and related instruments, and as a practical matter will supersede the private intercarrier agreements, when the State or States relevant in a particular accident are party to the new Convention.").

Whereas the "primary aim of the contracting parties to the [Warsaw] Convention" was to limit "the liability of air carriers in order to foster the growth of the ... commercial aviation industry," *Sulewski*, 933 F.2d at 184 (internal citations and quotation marks omitted), the contracting parties to the Montreal Convention expressly approved that treaty because, among other reasons, they recognized "the importance of ensuring protection of the interests of consumers in international carriage by air and the need for equitable compensation based on the principle of restitution." Montreal Convention, pmbl. The Senate has similarly recognized that "[t]he new Montreal Convention represents the culmination of decades of efforts by the United States and other countries to establish a regime providing increased protection for international air travelers and shippers." S. Exec. Rep. No. 108–8, at 2 (2003). Hence, commentators have described the Montreal Convention as a treaty that favors passengers rather than airlines. *See, e.g.,* Thomas J. Whalen, *The New Warsaw Convention: The Montreal Convention*, 25 Air & Space L. 12, 14 (2000) ("The Montreal Convention is no longer a Convention for airlines. It is a Convention for consumers/ passengers."); Batra, *supra*, at 443 ("the Montreal Convention recognizes the importance of ensuring protection of the interests of consumers in international air carriage").

delegates at the International Conference on Air Law held in Montreal, Canada (Montreal Conference) in May 1999; the delegates at the conference negotiated and signed the Montreal Convention. However, although President Clinton submitted the Montreal Convention to the Senate for ratification on September 6, 2000, *see* President's Message to the Senate Transmitting the Convention for the Unification of Certain Rules for International Carriage by Air with Documentation, 36 Weekly Comp. Pres. Doc.2013 (Sept. 11, 2000), the district court refused to give authoritative weight to the statements of the Montreal Conference delegates because the Senate had not ratified the Montreal Convention when the court granted partial summary judgment in favor of the airline defendants. *See Ehrlich,* 2002 U.S. Dist. LEXIS 21419, at *6 n. 2. As the district court correctly acknowledged, "[a]n unratified treaty has no force until ratified by a two-thirds vote of the Senate." *Id.* (citing *S.E.C. v. Int'l Swiss Inv. Corp.,* 895 F.2d 1272, 1275 (9th Cir. 1990)). *Cf. Flores v. Southern Peru Copper Corp.,* 343 F.3d 140, 162 (2d Cir.2003) ("A State only becomes bound by—that is, becomes a party to—a treaty when it ratifies the treaty.").

After the district court arrived at its decision, the legal landscape on which the Warsaw Convention once stood changed dramatically. Shortly before the parties in this appeal appeared for oral argument in August 2003, the Senate ratified the Montreal Convention on July 31, 2003. *See* 149 Cong. Rec. S10,870 (daily ed. July 31, 2003).

The Montreal Convention was designed to "enter into force on the sixtieth day following the date of deposit of the thirtieth instrument of ratification" with the International Civil Aviation Organization (ICAO). Montreal Convention, arts. 53(5),

(6). On September 5, 2003, after we heard oral argument in this appeal, the United States deposited the applicable instrument of ratification. *See* Press Statement, United States Department of State, Ratification of the 1999 Montreal Convention (Sept. 5, 2003), *available at http://www.state.gov/r/pa/prs/ps/2003/ 23851pf.htm;* Press Release, United States Department of Transportation, United States Ratifies 1999 Montreal Convention, Putting Treaty Into Effect (Sept. 5, 2003), *available at http://www.dot.gov/ affairs/dot10303.htm.*

As the thirtieth nation to ratify the treaty and to deposit an instrument of ratification with the ICAO, the United States triggered the conditions set by Article 53 of the Montreal Convention. *See* Press Release, International Civil Aviation Organization, Montreal Convention of 1999 on Compensation for Accident Victims Set to Enter Into Force (Sept. 5, 2003), *available at http://www.icao.int/icao/en/nr/ 2003/pio200314.htm.* In accordance with Article 53(6), the Montreal Convention therefore entered into force on November 4, 2003. *See* Media Note, United States Department of State, Entry Into Force of the 1999 Montreal Convention (Nov. 4, 2003), *available at http://www.state.gov/r/ pa/prs/ps/2003/25920.htm; see also* International Civil Aviation Organization, Treaty Collection, *at http://www.icao.int/icao/ en/leb/ mt199.htm* (last visited Mar. 4, 2004) (explaining that the Montreal Convention entered into force on Nov. 4, 2003).

In light of these events, we must consider what role, if any, the Montreal Convention and its negotiating history should play in this appeal. Despite its ratification and entry into force, we conclude that the Montreal Convention does not govern the appeal at bar and that we need not give the views expressed by various delegates

at the Montreal Conference, especially to the extent that these views relate solely to the Montreal Convention itself, dispositive weight.

█ Ordinarily, a particular treaty does not govern conduct that took place before the treaty entered into force. *See Chubb & Son v. Asiana Airlines,* 214 F.3d 301, 307 n. 4 (2d Cir.2000) (where the actions giving rise to a lawsuit took place in 1995, Montreal Protocol No. 4 did not affect the case despite the Senate's subsequent ratification of the protocol on September 28, 1998); *see also* Vienna Convention on the Law of Treaties, May 23, 1969, art. 28, 1155 U.N.T.S. 331, 339 (Vienna Convention) ("Unless a different intention appears from the treaty or is otherwise established, its provisions do not bind a party in relation to any act or fact which took place or any situation which ceased to exist before the date of the entry into force of the treaty with respect to that party.");[5] Restatement (Third) of the Foreign Relations Law of the United States § 322(1) (1987) (same).[6] In this instance, the accident that gave rise to the Ehrlichs' lawsuit took place on May 8, 1999, and they commenced their action against the airline defendants on September 27, 1999. These events oc-

curred several years before the Senate ratified the Montreal Convention and before that treaty entered into force. As such, neither the Montreal Convention nor the intentions of its drafters govern this appeal.

Although the shared expectations of the contracting parties to the Montreal Convention are not dispositive in the instant appeal, we see no reason why we should turn a blind eye to the views expressed by various delegates at the Montreal Conference where they shed light on the Warsaw Convention. The minutes of the Montreal Conference recorded statements by a delegate from the United States as well as statements from delegates who represented countries that also were parties to the Warsaw Convention. To the extent that these statements may help us better understand the way in which sister signatory nations and our own government's Executive Branch interpret Article 17 of the Warsaw Convention, we may employ such useful secondary sources to ascertain the appropriate meaning of Article 17. *See Commercial Union Ins. Co. v. Alitalia Airlines S.p.A.,* 347 F.3d 448, 457 (2d Cir. 2003).[7]

---

**5.** Although the United States has never ratified the Vienna Convention, we "treat the Vienna Convention as an authoritative guide to the customary international law of treaties." *Chubb & Son,* 214 F.3d at 308 n. 5, 309; *see also Fujitsu Ltd.,* 247 F.3d at 433.

**6.** The Ehrlichs have not cited to any evidence or authority that would suggest that the Montreal Convention was intended to apply retroactively. We have reviewed the Montreal Convention as well as its history and nothing therein indicates that either the parties to the Montreal Convention or Congress intended the Montreal Convention to apply retroactively.

**7.** In addition to their extensive reliance on the drafting history of the Montreal Convention,

the Ehrlichs appear to argue in their reply brief that, under Article 18 of the Vienna Convention, the *text* and *purpose* of the Montreal Convention should be given authoritative consideration regardless of whether the Senate ratified the latter treaty. Article 18 of the Vienna Convention provides that:

A State is obliged to refrain from acts which would defeat the object and purpose of a treaty when:
(a) It has signed the treaty or has exchanged instruments constituting the treaty subject to ratification, acceptance or approval, until it shall have made its intention clear not to become a party to the treaty; or
(b) It has expressed its consent to be bound by the treaty, pending the entry into force of the treaty and provided that

III. *Article 17 of The Warsaw Convention*

The Ehrlichs contend that, under Article 17 of the Warsaw Convention, air carriers are liable for mental injuries that accompany, but are not caused by, bodily injuries. The district court disagreed with that proposition and held that the Ehrlichs could "only recover for emotional damages caused by physical injuries." *Ehrlich,* 2002 U.S. Dist. LEXIS 21419, at *10.

To determine whether the district court properly construed the reach of the Warsaw Convention, we must interpret that treaty and ascertain the meaning of Article 17. The English translation of Article 17, as employed by the Senate when it ratified the Warsaw Convention in 1934, provides that:

> The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

49 Stat. at 3018. In *Eastern Airlines v. Floyd,* 499 U.S. 530, 552–53, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991), the Supreme Court analyzed the meaning of this provision and held that carriers could not be held liable under Article 17 for mental injuries that did not accompany bodily injuries. However, the Court "express[ed] no view as to whether passengers [could] recover for mental injuries that [were] accompanied by physical injuries." *Id.* at 552, 111 S.Ct. 1489.

To address the issue presented by this appeal, we must reach the question left unresolved by the Supreme Court in *Floyd.* We need to construe the Warsaw Convention and determine whether carriers may be held liable under Article 17 for mental injuries that accompany, but are not caused by, bodily injuries.[8]

In the proceedings below, neither the Ehrlichs, American Eagle, nor the district court addressed the meaning of the language of Article 17 with sufficient specificity. However, after reviewing that provision in accordance with the proper canons of treaty interpretation, we conclude, for reasons that are somewhat different from those of the district court, that Article 17

---

such entry into force is not unduly delayed.
Vienna Convention, art. 18; *see also* Restatement (Third) of the Foreign Relations Law of the United States § 312(3) (1987) ("Prior to the entry into force of an international agreement, a state that has signed the agreement or expressed its consent to be bound is obliged to refrain from acts that would defeat the object and purpose of the agreement."); *Mayagüezanos Por La Salud Y El Ambiente v. United States,* 198 F.3d 297, 304 n. 14 (1st Cir.1999).
 We decline to address the merits of that argument. The argument is "deemed waived, as it was never raised before the district court." *Anthony v. City of New York,* 339 F.3d 129, 136 n. 3 (2d Cir.2003).

8. For the purposes of this appeal, American Eagle does not dispute that the Ehrlichs alleg-

edly sustained mental and bodily injuries which were caused by an accident that took place on board its aircraft or during the evacuation therefrom. Moreover, on appeal, the Ehrlichs do not challenge the district court's conclusion that they failed to raise "a genuine issue of fact regarding a causal connection between their alleged bodily injuries and their mental suffering." *See Ehrlich,* 2002 U.S. Dist. LEXIS 21419, at *11. Instead, their appeal focuses on whether the court properly construed Article 17. Accordingly, we need not address whether an accident caused the Ehrlichs to suffer injuries on board an aircraft or in the course of any of the operations of disembarking; we also need not address whether the Ehrlichs' alleged physical injuries caused their alleged mental injuries.

allows passengers to bring a Warsaw Convention action against air carriers to recover for their mental injuries but only to the extent that they flow from bodily injuries.

### A. Plain Meaning of Article 17

■ "When interpreting a treaty, we begin with the text of the treaty and the context in which the written words are used." *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988) (internal citations and quotation marks omitted). If the words of the Warsaw Convention are " 'reasonably susceptible of only one interpretation,' our task of interpretation ends there." *Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1027 (2d Cir. 1996) (quoting *Buonocore v. Trans World Airlines*, 900 F.2d 8, 9–10 (2d Cir.1990)). "Where the language of such an international treaty is plain, a court must refrain from amending it because to do so would be to make, not construe, a treaty." *Commercial Union Ins. Co.*, 347 F.3d at 457.

"Because the only authentic text of the Warsaw Convention is in French," we must first examine the French text of that treaty in order to understand its provisions. *Floyd*, 499 U.S. at 535, 111 S.Ct. 1489. When read in French, Article 17 provides as follows:

> Le transporteur est responsable du dommage survenu en cas de morte, de blessure ou de toute autre lésion corporelle subie par un voyageur lorsque l'accident qui a causé le dommage s'est produit à bord de l'aéronef ou au cours de toutes opérations d'embarquement et de débarquement.

49 Stat. at 3005. Although the Ehrlichs contend that nothing in Article 17 precludes carriers from being held liable for mental injuries that accompany, but are not caused by, bodily injuries, that argument ignores the phrase "dommage survenu en cas de . . . lésion corporelle."

This phrase translates as "damage sustained in the event of . . . bodily injury." 49 Stat. at 3018. At least one court, on analyzing the meaning of these words *in English*, concluded that such language requires a claim for damages under Article 17 to "be *predicated* upon some objective identifiable injury to the body." *Rosman v. Trans World Airlines*, 34 N.Y.2d 385, 399, 358 N.Y.S.2d 97, 109, 314 N.E.2d 848, 856 (1974) (emphasis added). In *Rosman*, the New York Court of Appeals held that a plaintiff could recover under the Warsaw Convention only for the mental anguish that she suffered "as a result of" a physical injury because such anguish "would have flowed from the 'bodily injury.' " *Id.*, 34 N.Y.2d at 399, 358 N.Y.S.2d at 109, 314 N.E.2d at 856–57. According to that court, "[o]nce th[e] predicate of liability—the 'bodily injury'—is established, then the damages sustained as a result of the 'bodily injury' are compensable including mental suffering. . . . [O]nly the damages flowing from the 'bodily injury,' whatever the causal link, are compensable." *Id.*, 34 N.Y.2d at 399–400, 358 N.Y.S.2d at 109, 314 N.E.2d at 857.

If we were free to construe Article 17 without any reference to its French legal meaning, we might find the *Rosman* Court's analysis to be sufficient. However, to interpret Article 17 properly, we must initially consider the French legal meaning of the phrase "dommage survenu en cas de . . . lésion corporelle." *See Air France v. Saks*, 470 U.S. 392, 399, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985). We must do so "not because we are forever chained to French law by the [Warsaw] Convention," but rather

> because it is our responsibility to give the specific words of the treaty a meaning consistent with the shared expecta-

tions of the contracting parties. We look to the French legal meaning *for guidance* as to these expectations because the Warsaw Convention was drafted in French by continental jurists.

*Id.* (emphasis added; internal citations and quotation marks omitted).

The "mainstream view" adhered to by courts that have addressed the scope of Article 17 and considered the issue before us "is that recovery for mental injuries is permitted only to the extent the [emotional] distress is caused by the physical injuries sustained." *In re Air Crash at Little Rock, Arkansas, on June 1, 1999 (Lloyd v. American Airlines )*, 291 F.3d 503, 509 (8th Cir.) (*Lloyd*), *cert. denied*, 537 U.S. 974, 123 S.Ct. 435, 154 L.Ed.2d 331 (2002); *see also Ligeti v. British Airways PLC*, 2001 WL 1356238, at *4 (S.D.N.Y. Nov.5, 2001); *Alvarez v. American Airlines*, 1999 WL 691922, at *3–*5 (S.D.N.Y. Sept.7, 1999); *Longo v. Air France*, 1996 WL 866124, at *2 (S.D.N.Y. July 25, 1996); *Wencelius v. Air France*, 1996 WL 866122, at *1 (C.D.Cal. Feb.29, 1996); *Jack v. Trans World Airlines*, 854 F.Supp. 654, 663–68 (N.D.Cal.1994); *In re Inflight Explosion on Trans World Airlines Aircraft Approaching Athens, Greece on April 2, 1986*, 778 F.Supp. 625, 637 (E.D.N.Y.1991) (*Ospina*), *rev'd sub nom. on other grounds Ospina v. Trans World Airlines*, 975 F.2d 35 (2d Cir.1992); *Burnett v. Trans World Airlines*, 368 F.Supp. 1152, 1155–58 (D.N.M.1973); *Rosman*, 34 N.Y.2d at 395–400, 358 N.Y.S.2d at 106–10, 314 N.E.2d at 854–57. Only two district courts have adopted a contrary interpretation of Article 17. *See In re Air Crash at Little Rock, Arkansas on June 1, 1999*, 118 F.Supp.2d 916, 918–21 (E.D.Ark.2000) (*Little Rock* ), *rev'd*, *Lloyd*, 291 F.3d at 509–11; *In re*

*Aircrash Disaster Near Roselawn, Indiana on October 31, 1994*, 954 F.Supp. 175, 179 (N.D.Ill.1997) (*Roselawn* ).[9]

Most of the foregoing cases, like the district court below, did not consider the text of Article 17 to any significant degree. "It seems elementary to us," however, "that the language employed in Article 17 must be the logical starting point" for any effort to interpret the Warsaw Convention. *Day v. Trans World Airlines*, 528 F.2d 31, 33 (2d Cir.1975).

One significant decision among the aforementioned cases did engage in a measure of textual analysis. The mainstream position is "widely attributed" to *Jack v. Trans World Airlines*, a case decided by a district court in the Northern District of California. *See Lloyd*, 291 F.3d at 509. However, the Ehrlichs rely on *Jack* to contend that the phrase "dommage survenu en cas de ... lésion corporelle" does not refer to a causation requirement.

In *Jack*, the district court considered whether the plaintiffs could hold carriers liable under the Warsaw Convention for mental injuries that were not caused by bodily injuries. When the court read Article 17, it concluded that the provision did "not state that [emotional distress] damages must be caused by the bodily injury." *Jack*, 854 F.Supp. at 665. Instead, the court noted that Article 17 provided "that the carrier is liable for 'damage sustained in the event of ... bodily injury,'" and held that "[c]ausation is not implied in the French phrase 'dommage survenu en cas.'" *Id.* (citing 2 *Grand Larousse De La Langue Francaise* 1392 (Librairie LaRousse 1991) (defining "dommage"); 6 *Grand Larousse De La Langue Francaise* 5864 (Librairie LaRousse 1991) (defining

---

9. The Eighth Circuit recently reversed the *Little Rock* decision and thereby became the first United States Court of Appeals to follow the mainstream approach. *See Lloyd*, 291 F.3d at 509–11.

"survenir")). Despite this conclusion, the district court eventually determined that plaintiffs could recover under Article 17 for emotional distress only where such injuries flowed from physical injuries. *Id.* at 668.

Although we agree, for reasons that will soon become apparent, with the *Jack* Court's ultimate conclusion, we reject the court's incomplete textual interpretation of Article 17. The manner in which the *Jack* Court construed the words "dommage survenu en cas" is certainly a plausible one. However, several considerations lead us to conclude that the French text of Article 17 is equally susceptible to a contrary interpretation.

First, whereas the *Jack* Court examined the definitions of the words "dommage" and "survenu" and determined that neither word implies causation, we are far less certain that the word "survenu" does not refer to some measure of causation. One of the simplest methods "of determining the meaning of a phrase appearing in a foreign legal text" is "to consult a bilingual dictionary." *Floyd*, 499 U.S. at 536, 111 S.Ct. 1489. However, such dictionaries offer several different meanings for the verb "survenir," some of which can be understood to impart an element of causation and some of which cannot. *See, e.g., Merriam–Webster's French–English Dictionary* 336 (2000) (defining "survenir" as "to occur, to take place" as well as "to arrive (unexpectedly)"); *Collins Robert Unabridged French–English English–French Dictionary* 884 (5th ed.1998) (defining "survenir," *inter alia*, as to "arise"); *Cassell's French–English English–French Dictionary* 705 (1962) (defining "survenir" as "[t]o arrive or happen unexpectedly; to befall; to drop in"); *see also In re Air Disaster in Lockerbie, Scotland on December 21, 1988*, 733 F.Supp. 547, 553 (E.D.N.Y.1990) ("In this Court's own sur-

vey of French–English dictionaries, 'survenir' was found to be most frequently translated as 'to happen,' 'to arise,' or 'to arrive unexpectedly.' "), *aff'd, Lockerbie*, 928 F.2d at 1280–82.

In *Lockerbie*, we noted that we were "convinced that the proper translation" of the words " 'dommage survenu' " was " 'damage sustained.' " 928 F.2d at 1281. Nevertheless, we also indicated that, "[w]hatever the shades of meaning in the word 'survenu,' " the way in which the Warsaw Convention uses that term in Article 17 refers to some measure of causation. *See id.; see also In re Korean Air Lines Disaster of September 1, 1983*, 932 F.2d 1475, 1485 (D.C.Cir.1991) (*Korean Air Lines Disaster*) ("[T]he Article 17 phrase 'liable for damages sustained' strongly implies that the carrier's responsibility . . . extends only to the reparation of loss *resulting* from the death or injury of passengers.") (emphasis added). *Cf. Ospina*, 778 F.Supp. at 637 ("[T]he French legal meaning of the phrase 'dommage survenu' could not apply to mental injury alone, but . . . it would apply to mental injury connected with physical harm."). Given the different meanings that could be ascribed to the word "survenu," we cannot agree with the *Jack* Court that the phrase "dommage survenu en cas" definitively excludes an element of causation.

Second, even if a causation requirement could not be imputed from the word "survenu," such an element could nonetheless be attributed to the words "en cas de." In *Jack*, the district court concluded that causation could not be implied from the French phrase "dommage survenu en cas," but the court arrived at that determination by referring to the definitions of the words "dommage" and "survenu." This approach, however, ignores the meaning of the remaining words in the applicable phrase, *i.e.*, "en cas de . . . lésion corpo-

relle." In its legal sense, the word "cas" means, *inter alia,* "cause." *See Cassell's French–English English–French Dictionary, supra,* at 132; Jules Jéraute, *Vocabulaire Francais–Anglais et Anglais–Francais de Termes et Locutions Juridiques* 29 (1953). If "cas" means "cause," then the phrase "dommage survenu en cas de ... lésion corporelle," as those words are used in Article 17, would hold carriers liable for any "damages sustained in the cause of ... bodily injury." Such a translation is amenable to an interpretation that would allow passengers to recover for mental injuries only where they were caused by a bodily injury.

Notwithstanding this interpretation, we acknowledge that the words "en cas de" do not conclusively impose a causation requirement. Bilingual dictionaries also indicate that the word "cas" often means "circumstance," "instance," or "situation." *See Dahl's Law Dictionary French To English / English To French* 45 (2d ed.2001); *Cassell's French–English English–French Dictionary, supra,* at 132. When those meanings are ascribed to the word "cas," we are less certain that the phrase "en cas de" requires a causal link between a mental injury and a bodily injury since we can conceive of a mental injury sustained in the same situation or circumstance as a bodily injury where the former had not been caused by the latter. The case before us is an example of such a scenario.

We are also hesitant to credit that the words "en cas de" are the equivalent of a causation requirement because the drafters of the Warsaw Convention employed a different word in a subsequent portion of Article 17 to refer to causation. Article 17 provides that a carrier is liable for damage sustained "if the accident which *caused* the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking."

Warsaw Convention, art. 17 (emphasis added). The word "caused" in the English translation of the Warsaw Convention is taken from the original French text's use of the word "causé." *See* 49 Stat. at 3005. As the district court suggested in *Jack,* the failure of the Convention's drafters to use the word "causé" earlier in Article 17 in place of the words "en cas de" may have some significance. *See Jack,* 854 F.Supp. at 665. One plausible construction in light of this consideration is that the damages recoverable under Article 17 "need not be caused by the bodily injury, and may instead be those caused [solely] by the accident." *Id.*

Notably, the different meanings that may be attributed to the words "en cas de" have led commentators to disagree about whether those words refer to an element of causation. Some suggest that the language of Article 17 is "more naturally understood to require that any compensable damage be associated with the requisite bodily injury. [That is,] emotional distress should be the subject of compensation only if the distress is precipitated by and flows from a physical injury." Gregory C. Sisk, *Recovery For Emotional Distress Under The Warsaw Convention: The Elusive Search For The French Legal Meaning Of Lésion Corporelle,* 25 Tex. Int'l L.J. 127, 134 n.49 (1990); *see also* Rene H. Mankiewicz, *The Liability Regime Of The International Air Carrier* 141 (1981) ("[I]f Article 17 covers only 'bodily injury,' it does not encompass nervous shock, mental suffering, etc., which is not caused or accompanied by a physical injury."). Others, however, have reached the exact opposite conclusion. *See* Georgette Miller, *Liability In International Air Transport* 121 (1977) ("Article 17 does not literally require a causal link between the damage and the death, wounding, or other bodily injury.... [I]f damage occurs concurrently with death, wounding, or other bodily

injury, the requirement of Article 17 is satisfied."); *see also* Max Chester, Comment, *The Aftermath Of The Airplane Accident: Recovery Of Damages For Psychological Injuries Accompanied By Physical Injuries Under The Warsaw Convention*, 84 Marq. L.Rev. 227, 248 (2000) ("The text of the [Warsaw Convention] does not require ... that bodily injuries cause the mental injuries.... Where a plaintiff alleges a physical injury, thus satisfying *Floyd*, and states that the accident caused a psychological injury, thus satisfying the plain text of the treaty, the only logical conclusion is to permit recovery for the psychological injuries.").

Because a variety of different meanings reasonably can be imparted to the words "dommage survenu" and "en cas de" as they are used in Article 17, we are unable to definitively determine whether those words impose a causation requirement by reference, without more, to their literal meaning. *Cf. Jack*, 854 F.Supp. at 665 ("Whether the recoverable damages—including emotional distress—are those caused by the bodily injury or by the accident itself is unclear under Article 17."). Where, as here, a provision of the Warsaw Convention "is reasonably susceptible to more than one interpretation," we may employ other sources to "ascertain [its] appropriate meaning." *See Commercial Union Ins. Co.*, 347 F.3d at 457.

### B. *French Legal Materials*

When we seek to extrapolate the French legal meaning of particular words or phrases in the Warsaw Convention, we may turn to French legal materials for assistance in determining how French jurists would have understood those words or phrases in 1929. *See Floyd*, 499 U.S. at 537, 111 S.Ct. 1489. In reviewing such materials, we may examine the principal sources that lawyers trained in French civil law would have relied on in 1929: "(1) legislation, (2) judicial decisions, and (3) scholarly writing." *Id.*

As a general principle, any damage may, under French law, "give[ ] rise to reparation when it is real and has been verified." 2 Marcel Planiol & George Ripert, *Treatise On The Civil Law*, pt. 1, No. 868, at 471 (Louisiana State Law Institute trans., 11th ed.1959) (1939); *see also Floyd*, 499 U.S. at 539, 111 S.Ct. 1489; *cf.* Miller, *supra*, at 112 ("Provided the damage is *certain* and *direct*, all forms of damage can be compensated to their full extent."). As such, French law would allow a party to recover for "dommage matériel," Mankiewicz, *supra*, at 157, which encompasses "compensation for pecuniary loss resulting from death or injury." *Korean Air Lines Disaster*, 932 F.2d at 1487. That party could also recover for "dommage moral," Mankiewicz, *supra*, at 157, which covers compensation for non-pecuniary losses. *Korean Air Lines Disaster*, 932 F.2d at 1487. This latter category of loss is "usually equivalent to damages for pain and suffering, grief, shame, or disfiguration." *Lockerbie*, 928 F.2d at 1282; *see also* F.H. Lawson, *et al.*, *Amos And Walton's Introduction To French Law* 209 (3d ed. 1967) (Dommage moral "includes damage to a person's honour and consideration, such as damage occasioned by insults, defamation, and seduction. It covers the damage occasioned by deprivations of liberty and invasions of privacy. It also includes the mental suffering occasioned by the death of one's loved ones and the pain and suffering occasioned by physical injuries to oneself."). Such damages were recoverable in France when the Warsaw Convention was drafted and signed; as the Supreme Court has recognized, by 1929 "France—unlike many other countries—permitted tort recovery for mental distress." *Floyd*, 499 U.S. at 539, 111 S.Ct. 1489 (internal citations omitted).

More than two decades ago, one expert commentator on the Warsaw Convention, Dr. Rene Mankiewicz, contended that, "in 1929, French law had recognized for many years the right of a plaintiff to recover for mental suffering alone ... even though it was not caused by a physical injury." Mankiewicz, *supra*, at 145. However, the Supreme Court reviewed that commentator's argument in *Floyd* and refused to construe French law in such a broad fashion. *See Floyd*, 499 U.S. at 539–40 & n. 7, 111 S.Ct. 1489.

The Court noted that Dr. Mankiewicz cited two cases in support of his argument. *Id.* at 540 n. 7, 111 S.Ct. 1489. The first "involved recovery by a stepdaughter for emotional distress resulting from the death of her stepmother and the other involved recovery for injury to honor arising from adultery." *Id.* (citing Mankiewicz, *supra*, at 145). Despite these and other similar authorities, the Court explained that it had "been directed to no French case prior to 1929 that allowed recovery" for a mental injury "caused by *fright or shock*" in the absence of an incident in which someone "sustained physical injury." *Id.* at 539–40, 111 S.Ct. 1489 (emphasis added). In other words, when the Court sought to examine whether French law in 1929 allowed parties to recover for purely mental injuries, the Court limited the scope of French materials that it would consider as part of its analysis; the Court refused to rely on French judicial decisions that did not involve a mental injury caused by fright or shock.

The *Floyd* Court's limited approach to the scope of applicable French judicial authorities teaches that we may not broadly canvas French law to determine when a party could *generally* recover for a mental injury. Instead, our review of French law must be guided by French judicial decisions that narrowly address the specific type of mental injury at issue in the particular appeal before us.

We are aware that, under certain circumstances, French law allows parties to recover for "dommage moral" even if they have not suffered a physical injury. *See* Mankiewicz, *supra*, at 145 (citing the aforementioned decisions of the highest French court in 1923 and 1857); *see also Dahl's Law Dictionary French To English/English To French, supra*, at 112 (In accordance with the principle of dommage moral, "courts, for example, have taken account of the sentimental loss resulting from the disappearance of a family portrait; the affront to the religious sensibilities of a Jewish society caused by a breach of their butcher of his contractual undertaking not to sell non-kosher meat; the damage to the reputation of an actress by the theater's failure to display her name in letters of the agreed size."); 11 *International Encyclopedia Of Comparative Law* § 9–39, at 16–17 and nn.114–15 (Andre Tunc ed., 1986) (citing, as the first personal injury cases permitting recovery for non-pecuniary damages, an 1833 French decision in which "counsel for the plaintiff took as an illustration of *dommage moral* for which recovery should be permitted the grief of a family upon the death of one of their members," and an 1881 Belgian decision in a wrongful death case); Lawson, *supra*, at 209 ("dommage moral" covers, as one example, "damage occasioned by insults").

However, the circumstances and mental injuries in the foregoing situations are not analogous to the mental injuries implicated by the instant appeal. We have been directed to no French case prior to 1929 that allowed a party to recover for his own mental injuries caused by fright or shock suffered during an accident where they did not flow from physical injuries sustained by that same party. If anything, commen-

tators appear to indicate that, under French law, parties could recover in such a context for their own pain and suffering but only where such damages were attributable to their physical injuries. *See, e.g.,* Lawson, *supra,* at 209 (Dommage moral "includes ... the pain and suffering *occasioned by physical injuries to oneself.*") (emphasis added); *see also* Miller, *supra,* at 112 ("There is nothing in French law prohibiting compensation for any particular kind of damage, be it mental injury, suffering due to the death of a member of the family, or pain and suffering *due to a physical injury.*") (emphasis added); [10] *id.* at 114 (explaining that the damages recoverable in personal injury cases in common law courts are similar to those recoverable in France because a victim can recover for "pain and suffering *due to the injury*") (emphasis added).

We also note that one leading treatise on French law that dates back to the early Warsaw Convention era, and which was repeatedly cited by the Supreme Court in *Floyd, see* 499 U.S. at 538–39, 111 S.Ct. 1489, does not mention the type of mental injuries allegedly sustained by the Ehrlichs among its "principal" examples of "dommage moral." *See* 2 Planiol & Ripert, *supra,* No. 868A, at 472–73. Rather, the treatise cites the following examples as the "principal" applications of the concept of "reparation for moral damage":

(1) [i]njuries to honor, as in cases of defamation ... or in cases of seduction of a minor ...; (2) [i]njuries to senti-

ments of affection: in the case of accidental death, the near relatives of the victim are indemnified, not in their quality as heirs, but as relations suffering personally from the loss of affection of the victim ...; (3) [v]iolation of obligations arising out of marriage: for example in case of adultery, of refusing to receive the woman into the conjugal domicile ...; (4) [v]iolations of rights by the paternal power: when a teacher treats children contrary to good morals or decency ... or when third parties influence the child against obedience to its parents; (5) [i]njuries to professional interests, forbidden by a syndicate.

*Id.* Absent from that list are mental injuries caused by fright or shock and sustained by an individual during an accident over the course of which he also suffered unrelated physical injuries.[11]

With these considerations in mind, we are not persuaded that French jurists in 1929 would have read the phrase "dommage survenu en cas de ... lésion corporelle" in a manner that would have held a carrier liable for a passenger's mental injury in the absence of a *causal relationship* between such pain and suffering and a physical injury. Nonetheless, we acknowledge that our understanding of French law is limited by the treatises and judicial decisions available to us. Accordingly, although the Ehrlichs have made no effort to suggest that French law would require a different construction of Article

---

**10.** We are cognizant that Dr. Miller took the position that French law in 1929 permitted a party to recover for a mental injury irrespective of whether he also suffered a physical injury. However, as we explained earlier with respect to the same position advocated by Dr. Mankiewicz, the Supreme Court has refused to construe French law in such a broad fashion. Accordingly, we focus, as did the Supreme Court, on the specific examples

of liability for pain and suffering that Dr. Miller discusses.

**11.** The absence of that category of moral damages from the treatise is particularly notable since one of the two co-authors, Professor Ripert, "was a leading French delegate at the Warsaw Convention and an expert of the French Government at the CITEJA proceedings." *Floyd,* 499 U.S. at 543 n. 9, 111 S.Ct. 1489.

17, we do not rest our interpretation of Article 17 solely on our understanding of French legal materials. Instead, we also turn to additional sources to determine the meaning of that provision.

## C. *The Negotiating History of The Warsaw Convention*

By construing the phrase "dommage survenu en cas de ... lésion corporelle" to mean that carriers may be held liable only for mental injuries that flow from bodily injuries, we interpret the scope of Article 17 in a manner that is consistent with the negotiating history of the Warsaw Convention. In particular, that interpretation comports with the shared expectations of the parties that signed the Warsaw Convention.

To ascertain the meaning of a treaty, " 'we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties.' " *Saks*, 470 U.S. at 396, 105 S.Ct. 1338 (quoting *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 431–32, 63 S.Ct. 672, 87 L.Ed. 877 (1943)). These sources confirm that the drafters of the Warsaw Convention did not intend to expose carriers to liability for mental injuries that were not caused by bodily injuries.

"The treaty that became the Warsaw Convention was first drafted at an international conference in Paris in 1925." *Saks*, 470 U.S. at 401, 105 S.Ct. 1338. Article 5 of the draft protocol that emerged from the Paris conference (hereinafter the Paris Protocol) provided in pertinent part as follows: "Le transporteur est responsable dès accidents, pertes, avaries et retards." Ministère des Affaires Étrangères, *Conférence Internationale de Droit Privé Aérien (27 Octobre–6 Novembre 1925)*, at 79 (1926). When that text is translated into English, Article 5 of the Paris Protocol

specified that: "The carrier is liable for accidents, losses, breakdowns, and delays." *Floyd*, 499 U.S. at 542, 111 S.Ct. 1489 (internal citations and quotation marks omitted). This "expansive provision," which broadly held "carriers liable in the event of an accident, would almost certainly have permitted recovery for all types of injuries, including emotional distress." *Id.* (internal citations and quotation marks omitted).

The delegates at the Paris conference appointed a committee of experts, the CITEJA, "to revise its final protocol for presentation" at a second conference to be held in Warsaw. *Floyd*, 499 U.S. at 542–43, 111 S.Ct. 1489; *see also Day*, 528 F.2d at 34–35 ("The Paris conference appointed a small committee of experts ... to prepare a draft convention for consideration by the delegates at Warsaw."). In response, the CITEJA produced a preliminary draft of the Warsaw Convention. *See Minutes, Second International Conference On Private Aeronautical Law, October 4–12, 1929, Warsaw* 257–68 (Robert C. Horner & Didier Legrez trans., 1975) (*Warsaw Conference Minutes* ) (reprinting the preliminary draft). As part of this effort, the CITEJA divided Article 5 of the Paris Protocol into three separate subsections, "with one addressing damages for injury to passengers, the second addressing damages for injury to goods, and the third addressing losses caused by delay." *Floyd*, 499 U.S. at 543, 111 S.Ct. 1489; *see also Warsaw Conference Minutes, supra*, 264–65 (setting forth Article 21 of the CITEJA's preliminary draft of the Warsaw Convention, which divides the subject matter first broached in Article 5 of the Paris Protocol's liability provision among subsections (a), (b), and (c)).

The general CITEJA article that delineated these subsections, Article 21, introduced the phrase "dommage survenu."

*See Burnett,* 368 F.Supp. at 1157 (reprinting the French text of Article 21). Similarly, "[t]he CITEJA subsection on injury to passengers introduced the phrase 'en cas de . . . lésion corporelle.'" *Floyd,* 499 U.S. at 543, 111 S.Ct. 1489 (internal citations omitted); *see also Burnett,* 368 F.Supp. at 1157. In essence, Article 21, as developed by the CITEJA, provided in pertinent part: "Le transporteur est responsable du dommage survenu pendant le transport: (a) en cas de mort, de blessure ou de toute autre lésion corporelle subie par un voyageur." *See Burnett,* 368 F.Supp. at 1157 (internal citations and quotations marks omitted).[12] The CITEJA submitted its revisions to the second international conference that convened in Warsaw in 1929. *See Saks,* 470 U.S. at 401, 105 S.Ct. 1338.

The delegates at the Warsaw conference further divided the subject matter enumerated in the subsections of the CITEJA liability provision among three separate articles. *See Warsaw Conference Minutes, supra,* at 205–06. Of these three new provisions, Article 17 of the Warsaw Convention addressed injuries to passengers. *See id.* at 205. The aforementioned phrases introduced by the CITEJA were retained in Article 17 and were ultimately adopted by the Warsaw conference delegates. *See Floyd,* 499 U.S. at 543, 111 S.Ct. 1489; *see also Warsaw Conference Minutes, supra,* at 205–06. *Cf.* 49 Stat. at 3005 (setting out the text of Article 17 in French and including the aforementioned phrases therein). "Although there is no definitive evidence explaining why the CITEJA drafters chose this narrower language" over the expansive terminology employed in the earlier Paris Protocol, the Supreme Court has determined that "it is reasonable to infer that the Conference adopted the narrower language to limit the types of recoverable injuries." *Floyd,* 499 U.S. at 543, 111 S.Ct. 1489.

In other words, the Warsaw conference delegates did not employ the broad phrase "[l]e transporteur est responsable dès accidents" from the Paris Protocol, and instead adopted the narrower phrase "[l]e transporteur est responsable du dommage survenu en cas de . . . lésion corporelle," in order to *limit* the scope of a carrier's liability. As such, we conclude that they did not intend the latter phrase in Article 17 to allow passengers to expansively recover for mental injuries that accompanied, but were not caused by, bodily injuries. To conclude otherwise, we would need to believe that the contracting nations that signed the Warsaw Convention rejected the broad liability provision from the Paris Protocol yet nonetheless intended to allow passengers to recover for harms that were not recognized by many of the signatory nations.

Many of the nations that signed the Warsaw Convention, such as Czechoslovakia, Denmark, Germany, the Netherlands, the Soviet Union, and Sweden, did not recognize a cause of action for nonpecuniary harm in 1929. *See Zicherman v. Korean Air Lines Co., Ltd.,* 516 U.S. 217, 223, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996); *see also Floyd,* 499 U.S. at 544 & n. 10, 111 S.Ct. 1489; J. Kathryn Lindauer, Note, *Recovery For Mental Anguish Under The Warsaw Convention,* 33 J. Air L. & Com. 333, 339 (1975) ("At the time of the [Warsaw conference] negotiations, recovery for mental anguish was virtually unheard of as a legal cause of ac-

---

**12.** Article 21, when translated into English, provided in pertinent part that: "The carrier shall be liable for damage sustained during carriage: (a) in the case of death, wounding, or any other bodily injury suffered by a traveler." *Warsaw Conference Minutes, supra,* at 264.

tion."). Moreover, "in common-law jurisdictions mental distress generally was excluded from recovery in 1929." *Floyd,* 499 U.S. at 544 n. 10, 111 S.Ct. 1489.

The Warsaw Convention "was intended to act as an international uniform law, and therefore must be read in the context of the national legal systems of all of its members." *Reed v. Wiser,* 555 F.2d 1079, 1083 (2d Cir.1977) (internal citation omitted). Since a remedy for mental injuries was unknown to many, if not most, jurisdictions in 1929, the drafters of the Warsaw Convention most likely would have felt a need to make an unequivocal reference to that type of liability if they had intended to allow passengers to recover for such injuries. *See Floyd,* 499 U.S. at 545, 111 S.Ct. 1489. However, the drafters made no such unequivocal reference to liability for mental injuries that were not caused by bodily injuries. Rather, "there is no evidence that the drafters or signatories of the Warsaw Convention specifically considered liability for psychic injury." *Id.* at 544, 111 S.Ct. 1489. When we take into account the absence of an unequivocal reference to that type of liability in tandem with the decision by the Warsaw conference delegates to employ the phrase "dommage survenu en cas de ... lésion corporelle" to limit a carrier's liability, we are not persuaded that the nations that signed the Warsaw Convention in 1929 intended to permit passengers to hold carriers liable for mental injuries that accompanied, but were not caused by, bodily injuries.

For the same reasons, we would adhere to that interpretation of Article 17 even if we were to assume, for the sake of argument, that French law in 1929 did permit parties to recover for the type of mental injuries at issue in this appeal. The Supreme Court has not "forever chained [the Warsaw Convention] to French law." *Saks,* 470 U.S. at 399, 105 S.Ct. 1338. As

we mentioned earlier, courts must "give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties." *Id.* Although the Court has explained that the French legal meaning of the words in Article 17 offers *"guidance* as to these expectations," *id.* (emphasis added), the Court has also held that it is implausible to believe that the contracting parties to the Warsaw Convention, through their mere use of the French language, expected to adopt French legal principles. *See Zicherman,* 516 U.S. at 223, 116 S.Ct. 629.

In *Zicherman,* the Court sought to interpret the meaning of the French word "dommage" in Article 17. *See id.* at 221–24, 116 S.Ct. 629. Over the course of its analysis, the Court found it unlikely that the contracting parties to the Warsaw Convention would have understood that term to require compensation for harm recognized by France but not recognized elsewhere. *See id.* at 223, 116 S.Ct. 629. As such, the Court did not construe "dommage" to mean the harm specifically compensable under French law. *See id.* at 223–24, 116 S.Ct. 629. *Cf. Floyd,* 499 U.S. at 539–40, 111 S.Ct. 1489 (declining to read into the Warsaw Convention a claim for purely "psychic injury that evidently was possible under French law in 1929 [but that] would not have been recognized in many other countries represented at the Warsaw Convention"). In essence, "[t]he Supreme Court ... has counseled against adopting an interpretation of the Convention that would have been discordant or offensive to the majority of [its] signatories." *Katsuko Hosaka v. United Airlines,* 305 F.3d 989, 998 (9th Cir.2002), *cert. denied,* 537 U.S. 1227, 123 S.Ct. 1284, 154 L.Ed.2d 1089 (2003). Applying that principle to the instant appeal, we find it unlikely that the contracting parties to the Warsaw Convention expected that their use of the French phrase "dommage sur-

venu en cas de `... lésion corporelle" would have held carriers liable for nonpecuniary harm that may have been recognized in France but that was not recognized by many of the other signatory nations.

This conclusion is especially compelling when we take into account how the drafters of the Warsaw Convention came to settle on that phrase. The more expansive Paris Protocol liability provision was submitted to the CITEJA so that it could "produce a provision more readily acceptable to those nations whose law was not so liberal" as that of France. *Burnett*, 368 F.Supp. at 1157. The nations that negotiated the Warsaw Convention therefore did not intend to strictly bind themselves to French legal principles of liability; indeed, the Warsaw conference delegates eventually adopted the "narrower language" introduced by the CITEJA to limit the types of injuries that were recoverable under the Warsaw Convention. *Floyd*, 499 U.S. at 543, 111 S.Ct. 1489.

■ In sum, the negotiating history of the Warsaw Convention demonstrates that the phrase "dommage survenu en cas de ... lésion corporelle" should be read to impose a causation requirement. Article 17 therefore permits passengers to hold a carrier liable for a mental injury only to the extent that it was caused by a physical injury.

### D. *Purpose*

■ Where, as here, the literal meaning of a treaty is ambiguous, "we may look to the purposes of the treaty to aid our interpretation." *Katsuko Hosaka*, 305 F.3d at 996; *see also Commercial Union Ins. Co.*, 347 F.3d at 457 ("[W]e strive to conform our reading [of a treaty] to the treaty's original intent and purpose."). In this instance, our interpretation of Article 17 accords with the Warsaw Convention's "primary purpose of ... limiting the liability of air carriers in order to foster the growth of the fledgling commercial aviation industry." *Floyd*, 499 U.S. at 546, 111 S.Ct. 1489.

"Whatever may be the current view among Convention signatories, in 1929 the parties were more concerned with protecting air carriers and fostering a new industry rather than providing a full recovery to injured passengers." *Id.* By reading Article 17 in a narrow fashion to preclude a physical injury from exposing a carrier to liability for unrelated mental injuries, we respect that legislative choice.

### E. *Avoidance of Anomalous and Illogical Results*

Another consideration also leads us to conclude that carriers are not liable under Article 17 for mental injuries that accompany, but are not caused by, bodily injuries. Whenever possible, interpretations of a treaty that produce anomalous or illogical results should be avoided. *See El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 171, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999) (rejecting an interpretation of the Warsaw Convention that would have yielded anomalous results); *see also Distribuidora Dimsa S.A. v. Linea Aerea Del Cobre S.A.*, 768 F.Supp. 74, 78 (S.D.N.Y.1991). *Cf. National Foods v. Rubin*, 936 F.2d 656, 660 (2d Cir.1991) ("When we interpret a statute, we should avoid ... unreasonable results if we can."); *United States v. Meyer*, 808 F.2d 912, 919 (1st Cir.1987) ("It is settled beyond peradventure that legislation 'should be interpreted to avoid ... unreasonable results whenever possible.' As one respected scholar has observed, '[i]t has been called a golden rule of statutory interpretation that unreasonableness of the result produced by one among alternative possible interpretations of a statute is a reason for

rejecting that interpretation.' ") (internal citations omitted); *Int'l Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Brock,* 816 F.2d 761, 766 (D.C.Cir.1987) ("It is well-understood that statutes must be construed so as to avoid illogical or unreasonable results."). If we construed Article 17 in a manner that allowed a passenger to hold a carrier liable for his mental injuries regardless of whether they were causally connected to a bodily injury, that interpretation would yield "illogical results." *Alvarez,* 1999 WL 691922, at *5.

The interpretation of Article 17 favored by the Ehrlichs would give rise to anomalous and illogical consequences because "similarly situated passengers [would be] treated differently from one another on the basis of an arbitrary and insignificant difference in their experience." *Id.* For example, a passenger who sustained a mental injury but no bodily injury would be unable to look to Article 17 for relief whereas a co-passenger who suffered the same mental injury yet fortuitously pinched his little finger in his tray table while evacuating and thereby suffered an unrelated bodily injury would be able to hold the carrier liable under the Warsaw Convention.

Such considerations led the district court in *Jack* to "read a causal component" into the words "dommage survenu en cas de," notwithstanding its determination that those words did not imply a causation requirement. *See Jack,* 854 F.Supp. at 665,

668. Although we disagree with the *Jack* Court's interpretation of the words "dommage survenu en cas de ... lésion corporelle," we agree with the court that "[t]he happenstance of getting scratched on the way down the evacuation slide [should] not enable one passenger to obtain a substantially greater recovery than that of an unscratched co-passenger who was equally terrified by the plane crash." *Id.; see also Longo,* 1996 WL 866124, at *2. *Cf. American Tobacco Co. v. Patterson,* 456 U.S. 63, 71, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982) ("Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible."); *Quinn v. Butz,* 510 F.2d 743, 753 (D.C.Cir.1975) ("[A] construction of a statute leading to unjust or absurd consequences should be avoided.").

By construing Article 17 in a fashion that avoids anomalous and illogical results, our interpretation also comports with the Supreme Court's decision in *Floyd.* The *Floyd* Court held that an air carrier could not be held liable for purely mental injuries. *See Floyd,* 499 U.S. at 552, 111 S.Ct. 1489. If we determined that a "physical injury, no matter how minor or unrelated," could "trigger recovery of any and all post-crash mental injuries," that conclusion would violate the "spirit of *Floyd.*" *Lloyd,* 291 F.3d at 510.[13]

As then-District Judge Barrington D. Parker explained in *Longo v. Air France,* "[a]llegations of mental distress that is un-

---

**13.** The Ehrlichs, quoting *Jack,* suggest that the *Floyd* Court would not have construed Article 17 to require a causal link between mental and bodily injuries given the Court's so-called "careful avoidance of any mention of a need for a causal connection between the bodily injury and the damages recoverable under the Warsaw Convention." *Jack,* 854 F.Supp. at 666. That argument, however, reads far too much into the Court's silence on that issue. The Court's failure to comment on

the need for a causal connection between mental and bodily injuries is easily explained. "That issue [was] not presented" in *Floyd* because no passengers alleged that they sustained a "physical injury." *Floyd,* 499 U.S. at 552–53, 111 S.Ct. 1489. Hence, we hold that permitting passengers to recover for mental injuries that were not caused by bodily injuries violates the *spirit,* rather than the letter, of *Floyd.*

related to physical injury—*i.e.,* mental distress that does not flow from physical injury …—are no different from the pure mental injury claims proscribed by *Floyd.*" *Longo,* 1996 WL 866124, at *2. Consequently, if Article 17 were read as if it encompassed liability for mental injuries that were not caused by bodily injuries,

> plaintiffs would be able to skirt *Floyd*'s bar on recovery for purely psychological injuries simply by alleging that they have suffered some physical injury, no matter how slight or remote. As a practical matter, the substantive rule of law announced in *Floyd* would thus be converted into an easily satisfied pleading formality, and a back door would be impermissibly opened to recovery for purely psychological injuries.

*Alvarez,* 1999 WL 691922, at *4. Such a construction would improperly encourage artful pleading and would therefore "scarcely advance the predictability that adherence to the treaty has achieved worldwide." *Tsui Yuan Tseng,* 525 U.S. at 171, 119 S.Ct. 662 (rejecting an interpretation of Article 17 that would have encouraged artful pleading).

The Ehrlichs, citing the *Roselawn* decision, contend that the courts in cases such as *Alvarez, Longo,* and *Jack* improperly "read[ ] into the [Warsaw Convention] what is not there in order to prevent fraud or to eliminate any disparity in recoveries." They argue that such efforts constitute "an exercise in judicial policy-making that, however well intended, violate[ ] the separation of powers doctrine."

In *Roselawn,* a district court in the Northern District of Illinois held that

> the commands of Article 17 itself … are relatively plain. Article 17 … expressly requires a causal link only between "damage sustained" and the accident.… Article 17 does not say that a carrier will only be liable for damage

caused by a bodily injury, or that passengers can only recover for mental injuries if they are caused by bodily injuries.

954 F.Supp. at 179 (internal citations omitted). Since that court concluded that nothing in Article 17 required such an interpretation, the court held it was "not free to re-write the terms of the Warsaw Convention in an attempt to remedy" the "possible inequities of recovery among equally terrified fellow passengers." *Id.*

We find the *Roselawn* Court's analysis to be unpersuasive for several reasons. First, the *Roselawn* Court's examination of the meaning of Article 17 was, by and large, conclusory. The district court (a) engaged in a cursory analysis of Article 17's text, (b) did not review French legal materials and the drafting history of Article 17 to better understand the meaning of that provision, and (c) did not try to conform its construction of the Warsaw Convention to the treaty's purposes. As such, the persuasive force of that decision is limited. *Cf. Katsuko Hosaka,* 305 F.3d at 1002.

Second, we reject the *Roselawn* Court's criticism as misguided. In *Roselawn,* the district court indicated that Article 17 could be construed only to require a causal connection between mental and bodily injuries if a court rewrote the terms of the Warsaw Convention for improper policy reasons. *See* 954 F.Supp. at 179. We disagree. We read Article 17 to impose such a requirement because that construction is consistent with the text of the treaty, French law, the negotiating history as well as the purposes of the Warsaw Convention, and, as we shall shortly discuss, the judicial decisions of sister signatory nations and the views of our Executive Branch. As Justice Story explained when he discussed the pertinent principles that

courts should apply to the construction of a treaty:

> We are to find out the intention of the parties by just rules of interpretation applied to the subject matter; and having found that, our duty is to follow it as far as it goes, and to stop where that stops—whatever may be the imperfections or difficulties which it leaves behind.

*The Amiable Isabella,* 19 U.S. (6 Wheat.) 1, 71, 5 L.Ed. 191 (1821); *see also Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 134–35, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989). We adhere to that directive by arriving at our interpretation of Article 17 through the traditional and legitimate tools of treaty construction, as delineated by the Supreme Court in *Saks, Floyd, Zicherman,* and *Tsui Yuan Tseng,* rather than through some supposed foray into the realm of judicial policy-making.

### F. *Judicial Decisions of Sister Signatories*

When we search for the meaning of the words employed in the Warsaw Convention, we may consult the judicial decisions of our sister signatories to the Convention. *See Floyd,* 499 U.S. at 550, 111 S.Ct. 1489; *see also Katsuko Hosaka,* 305 F.3d at 993–94 (courts may turn to "the decisions of the courts of other signatories" to ascertain the Warsaw Convention's "meaning"). While few decisions are precisely on point, the one authority of which we are aware that expressly addresses the issue before us also construes Article 17 in the same manner that we do.

Several years ago in Australia, the Court of Appeal of the Supreme Court of New South Wales (Court of Appeal) examined whether a passenger who suffered physical injuries could recover for unrelated mental injuries under the Warsaw Convention. *See American Airlines v. Geor-*

*geopoulos & Anor,* [No. 2] (Aug. 5, 1998) N.S.W.S.C. 463 (N.S.W.Ct.App.) (unreported decision), *available at http:// www.austlii.edu.au/au/cases/nsw/supreme_ct/1998/463.html (Georgeopoulos ).* In *Georgeopoulos,* two plaintiffs, Peter Georgeopoulos (Georgeopolous) and his wife, Victoria Jimouras (Jimouras), sought to recover damages for injuries they had suffered while traveling as passengers from Sydney, Australia, to Hawaii on an aircraft operated by American Airlines. *Id.* Their legal actions were based on Article 17 of the Warsaw Convention. A Magistrate of the Local Court initially decided the matter in favor of American Airlines after he concluded that Georgeopolous and Jimouras were not entitled to bring an action for "nervous shock and/or mental suffering" pursuant to Article 17. *Id.* The plaintiffs appealed and the matter came before Judge Ireland of the Supreme Court of New South Wales. Judge Ireland held that "the Anglo–Australian approach to nervous shock is such that it is to be classified as 'bodily injury' " and remitted the case to the Magistrate. *Id.*

American Airlines appealed Judge Ireland's decision. The Court of Appeal found that the Magistrate had employed a phrase that lacked precise meaning when he averred to "nervous shock." *See American Airlines v. Georgeopoulos,* (Sept. 26, 1996) 1996 NSW LEXIS 3402, at *18–*19 (N.S.W.Ct.App.). The Court of Appeal instead focused on whether the plaintiffs had suffered shock that "cause[d an] injury and if so what was the nature of the injury." *Id.* at *23. Since the court concluded that the Magistrate had used "a label of dubious medical acceptability ... without finding precisely what injury, if any, the passenger[s][had] suffered," the court set aside Judge Ireland's decision, remanded the case to the Magistrate so that he could hear evidence and make the appropriate findings of fact, and adjourned any further

hearing of the appeal in the interim. *Id.* at *23–*25.

On remand, the Magistrate found that Georgeopoulos did not suffer "any direct physical injury as the result of what occurred on board the aircraft," but that he did suffer "nervous shock in the form of a mild post[-]traumatic stress disorder." *Georgeopoulos, supra.* With respect to Jimouras, the Magistrate found that she had suffered physical and mental injuries, but that the former were "unrelated" to the latter. *Id.*

With these findings of fact in hand, the Court of Appeal once again considered whether Georgeopoulos or Jimouras could recover for their mental injuries. *Id.* During that appeal, American Airlines argued that the Magistrate's original verdict in its favor should be sustained in light of the Court of Appeal's intervening decision in *Kotsambasis v. Singapore Airlines, Ltd.;* (1997) 140 F.L.R. 318 (N.S.W.Ct.App.). There, all three Judges of Appeal agreed that the term "bodily injury" in the Warsaw Convention did not encompass a purely psychological injury. *See id.* at 323 (Meagher, *J.A.*); *see also id.* at 328 (Powell, *J.A.*); *id.* at 329 (Stein, *J.A.*). However, although Judge Stein agreed with the lead opinion written by Judge Meagher, he also further remarked that "where mental anguish follows and is caused by physical injury, recovery for both injuries is covered." *Id.* at 328.

In *Georgeopoulos,* the passengers' counsel, relying on *Roselawn,* argued that Article 17 was satisfied "if in consequence of the accident there was physical injury or manifestation of physical injury, even though neither were causative of psychological injury nor caused by psychological injury." *Georgeopoulos, supra.* The Court of Appeal, however, rejected the *Roselawn* Court's interpretation of Article 17 and concluded that Judge Stein had correctly set forth "the ambit of recovery for psychic injury" in *Kotsambasis. Id.* As Judge Sheller explained, under Article 17 the damage caused by the accident

> must also be sustained, that is to say experienced or suffered, "in the event of," relevantly, bodily injury suffered by the passenger. This is the damage for which the carrier is liable. I do not think Article 17 means that if the passenger died or suffered bodily injury, the carrier is liable for any damage caused by the accident if the damage was not the result of the death or bodily injury.

*Id.* Both Judge Beazley and Judge Meagher agreed with Judge Sheller's opinion. Because neither Georgeopoulos nor Jimouras suggested that their mental injuries were the consequence of any physical injury, the Court of Appeal held that American Airlines was not liable under Article 17 for these injuries. *Id.*

The opinions of sister signatories, as reflected in their judicial decisions, are "'entitled to considerable weight.'" *Saks,* 470 U.S. at 404, 105 S.Ct. 1338 (quoting *Benjamins v. British European Airways,* 572 F.2d 913, 919 (2d Cir.1978)). Australia is a signatory to the Warsaw Convention and our interpretation of Article 17 is in accord with *Georgeopoulos,* a decision issued by one of Australia's state courts.[14]

---

14. In *Olympic Airways v. Husain,* —— U.S. ——, 124 S.Ct. 1221, 1228 n. 9, 157 L.Ed.2d 1146 (2004) (internal citation omitted and alteration added), the Supreme Court recently indicated that courts should hesitate before "'follo[wing]'" the judicial decisions issued by the intermediate appellate courts of sister Warsaw Convention signatories, such as those of Australia, where those nations' respective courts of last resort, such as the High Court of Australia, have yet to speak. That principle, however, does not apply to the instant appeal because we are not "'follo[wing]'" the Court of Appeal's decision in *Georgeopoulos.* Rath-

Further corroboration for our construction of Article 17 may also be found in the opinions expressed by certain Lords of Appeal in Ordinary (Law Lords) of the House of Lords in *Morris v. KLM Royal Dutch Airlines*, [2002] 2 A.C. 628 (H.L.), and *King v. Bristow Helicopters Ltd.*, [2002] 2 A.C. 628 (H.L.). In those consolidated appellate decisions, the Law Lords addressed whether passengers who suffer purely mental injuries or adverse physical manifestations caused by mental injuries may maintain claims against a carrier under Article 17 of the Warsaw Convention.[15]

The Law Lords, unsurprisingly, devoted much of their discussion in *Morris* and *King* to those specific issues, which are not relevant to the case before us. Nonetheless, we note that Lord Hobhouse of Woodborough briefly touched on the question raised by the instant appeal. He explained that

[t]he use of the phrase "in the event of" ("en cas de") does not mean that any wound suffered by the passenger at any time between the commencement of embarkation and the completion of disembarkation will suffice to permit any claim for damages. Thus, there must have been an accident which has caused the death, the wounding or the *bodily injury* suffered by the passenger *which caused the damage complained of.*

*Id.* at 672 (second emphasis added). Moreover, Lord Steyn, on examining Article 17, found that a mental injury might be relevant to liability under that provision in only two respects: (a) where "pain and suffering [had been] *caused* by physical injury" and (b) where an "accident causes mental injury or illness which in turn causes adverse physical symptoms, such as strokes, miscarriages or peptic ulcers." *Id.* at 640–41 (emphasis added).[16] Hence, leading jurists from the United Kingdom,

er, we have construed Article 17 in accordance with the ordinary canons of treaty interpretation and *Georgeopoulos* does no more than corroborate our understanding of that provision, further persuading us to adhere to a construction shared by our sister signatories. *Cf. Tsui Yuan Tseng*, 525 U.S. at 175–76 & n. 16, 119 S.Ct. 662 (recognizing that the opinions issued by, *inter alia*, the intermediate appellate and trial courts of sister signatories corroborated the Supreme Court's understanding of Article 17 and were therefore entitled to some degree of consideration).

**15.** In *Morris*, an unaccompanied minor traveling aboard a KLM Royal Dutch Airlines flight fell asleep after her meal; when she awoke, she discovered the male passenger sitting next to her caressing her thigh. Although she did not sustain a physical injury, the incident caused her to suffer from clinical depression and she brought an action against the airline to recover for her mental injury. In contrast, in *King*, a passenger brought an action to recover both for his mental injuries and for the physical manifestations of those injuries. The passenger sustained such damages after he boarded a helicopter owned and

operated by Bristow Helicopters Ltd. The helicopter took off from a platform in the North Sea in poor weather, ascended and hovered for a short period, and then, after two of its engines failed, descended and landed heavily on the helideck of the platform. The passenger aboard the helicopter did not suffer any immediate physical injury. However, he was extremely frightened and developed several psychiatric conditions, including post-traumatic stress disorder, as a result of the accident. That stress led to the onset of peptic ulcer disease.

The Law Lords unanimously agreed that the passenger in *Morris* could not maintain a claim against the air carrier for her injury whereas the passenger in *King* could maintain a claim, albeit only to the limited extent that it was premised on his peptic ulcer disease. However, the Law Lords were divided over the rationales that supported their judgment.

**16.** The other three Law Lords in *Morris* and *King* did not comment on whether a carrier could be held liable under the Warsaw Convention for mental injuries with no causal connection to a physical injury.

a signatory of the Warsaw Convention, have concluded that a carrier's liability under Article 17 is limited to the damage sustained as a consequence of the death, wounding, or bodily injury suffered by a passenger. To this extent, our interpretation of Article 17 comports with their reading of that provision.

The applicable judicial authorities of our sister Warsaw Convention signatories support the meaning we ascribe to Article 17. This consideration further leads us to adhere to an interpretation of Article 17 that is "shared by our treaty partners." *Tsui Yuan Tseng*, 525 U.S. at 176, 119 S.Ct. 662.

### G. *The Montreal Conference*

▇ "If the plain text [of a treaty] is ambiguous, we [may] look to other sources," such as the "post[-]ratification understanding of the contracting parties," to "elucidate the treaty's meaning." *Katsuko Hosaka*, 305 F.3d at 993–94. In this respect, "the opinions of sister signatories at international conferences" may sometimes prove to be helpful. *Commercial Union Ins. Co.*, 347 F.3d at 457. The Ehrlichs, relying extensively on the statements expressed by various delegates at the Montreal Conference, contend that the opinions of sister Warsaw Convention signatories as well as those of our Executive Branch support their interpretation of Article 17. However, "[t]he official minutes of the Montreal [Conference] tell a less conclusive story." *Katsuko Hosaka*, 305 F.3d at 1000.

### 1. *Conference Discussions*

On May 28, 1999, representatives from over fifty countries who attended the Montreal Conference in May 1999 approved the Montreal Convention. *See* Blanca I. Rodriguez, *Recent Developments In Aviation Liability Law*, 66 J. Air L. & Com. 21, 25–26 (2000). That treaty, like its Warsaw predecessor, governs the international transportation of persons, baggage, and goods by air. *See* Montreal Convention, art. 1(1). Article 17(1) of the Montreal Convention is similar to Article 17 of the Warsaw Convention. It provides that a "carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking." Montreal Convention, art. 17(1).[17]

When the delegates at the Montreal Conference discussed the scope of that provision before they approved the new Convention, they specifically considered extending a carrier's liability to mental injuries. However, their discussions did not lead to a general consensus on that subject; rather, they evidence a discordant chorus of voices.

On the third day of the Montreal Conference, the delegates from Sweden and Norway proposed that the words "or mental" be introduced in the first sentence of the applicable liability provision in the new Convention. *See* 1 International Civil Aviation Organization, *Minutes, The International Conference On Air Law,*

---

**17.** This language is taken from the English text of the Montreal Convention. We note that, "whereas only the French text of the Warsaw Convention is authentic, the French and English texts of the Montreal Convention are equally authentic." *Katsuko Hosaka*, 305 F.3d at 996 n. 8 (citing the text following Montreal Convention, art. 57 ("DONE at Montreal on the 28th day of May of the year one thousand nine hundred and ninety-nine in the English, Arabic, Chinese, French, Russian and Spanish languages, all texts being equally authentic.")).

*Montreal, 10–28 May 1999,* at 67 (2001) (*Montreal Conference Minutes*). At that stage of the Conference, a carrier's liability for injuries to passengers was set forth in Article 16 of the draft Convention under discussion. *See id.* If the Swedish–Norwegian proposal had been adopted, Article 16 would have read as follows: "The carrier is liable for damage sustained in the case of death or bodily *or mental* injury of a passenger." *Id.* (emphasis added). As Sweden's delegate explained, the proposal sought to secure for passengers "the right to compensation for mental injuries that they had suffered in case of an accident. This right [would have] appl[ied] whether or not the passenger also suffered a bodily injury." *Id.*

The Conference delegates responded to that proposal with a wide array of positions and counter-proposals, many of which contradicted one another. Certain nations, such as Chile, Denmark, the United Kingdom, the Dominican Republic, Panama, Namibia, Colombia, Switzerland, Finland, and Spain supported the Swedish–Norwegian proposal. *See id.* at 67–68, 72–74. Other nations, such as Germany, France, and New Zealand, supported the expansive principle of liability on which the Swedish–Norwegian proposal rested, but disagreed about the exact words that could best effectuate it. *See id.* at 68, 72.

Not all nations supported the Swedish–Norwegian proposal and its expansive reach. Certain nations, such as Saudia Arabia, Ethiopia, Austria, Mauritius, Algeria, Madagascar, and India, expressed reservations about or altogether opposed the inclusion of language in the new Convention that would have held carriers liable for "mental" injuries. *See id.* at 69, 70–72. Other nations, such as China, Cameroon, Egypt, Italy, Senegal, and Yemen, agreed that the liability provision in the new Convention should be extended to cover mental injuries, but sought to limit the scope of that liability; they suggested that, to balance the interests of the carrier and the passenger, the new Convention should limit carrier liability for mental injuries to situations in which they resulted directly from bodily injuries. *See id.* at 70–73. In contrast, Singapore's delegate proposed that Article 16 should only retain the words "bodily injury," since that would "allow [recovery] for mental injury in cases where the mental injury claim, accompanied by physical injury, manifested in physical injury." *Id.* at 70. The delegate from the United Arab Emirates adopted a somewhat similar position; although that delegate did not support a liability provision that included the words "mental injury," the delegate was agreeable to their inclusion as a compromise as long as they were "qualified" such that they referred solely "to a mental injury that resulted in a bodily injury that was caused by the negligence or misconduct of the carrier." *Id.* at 72.

The divisions among the delegates that became apparent on the third day of the Montreal Conference in response to the Swedish–Norwegian proposal led the President of those proceedings, Dr. Kenneth Rattray (Dr. Rattray), to determine that further consultations on the subject were necessary. *Id.* at 74. Those discussions were held among members of a working group known as the "Friends of the Chairman" (alternatively referred to as the Friends), *id.,* which consisted of a "manageable" body of twenty-eight nations, including the United States, "who were given the task of working" on certain "central issues." 1 Charles F. Krause & Kent C. Krause, *Aviation Tort And Regulatory Law* § 11:14, at 11–52 (2d ed.2002). The Friends met under the direction of Dr. Rattray, who served not only as the President of the Montreal Conference but also as the Chairman of that working group.

See id.; see also Montreal Conference Minutes, supra, *at 74.*

Although the discussions held by the Friends evidence a greater degree of consensus than existed on the third day of the Conference, we bear in mind that the views expressed by such Friends were the opinions of a select and limited group of delegates whose views did not necessarily correspond to those of many other delegates who did not sit on that working group. For example, Friends such as Chile, the United Kingdom, New Zealand, Sweden, and Switzerland sought to include language in the new Convention that would have allowed passengers to recover for mental injuries even in the absence of a physical injury. *See Montreal Conference Minutes, supra,* at 112–14. However, that position could not easily be reconciled with the contrary views expressed earlier by various delegates in response to the Swedish–Norwegian proposal; such delegates had either resisted including a provision in the new Convention that would have allowed passengers to recover for mental injuries or sought to limit that liability to mental injuries that directly resulted from a physical injury. Indeed, after they had been briefed about the Friends' discussions, several Asian nations that were not members of the Friends of the Chairman working group continued to press for a liability provision that limited recovery for mental injuries to those "arising from" a bodily injury. *See id.* at 141.

Moreover, although not all of the Friends' differences were necessarily given a voice during specific meetings of the Friends of the Chairman working group, the Friends themselves were divided on the issue of liability. The Friends did not unanimously support the aforementioned expansive language initially proposed by Chile at the first session of that group. During that meeting, Egypt and Vietnam tried to limit the scope of Article 16 of the draft Convention under discussion to liability for mental injuries "associated" with bodily injuries. *See id.* at 112–15. Outside of the meetings of the working group, Friends such as China and India pressed for a narrower liability provision than that proposed by Chile. *See id.* at 141–42. When the discussions of the Friends of the Chairman working group were first described to the other general delegates of the Conference, China associated itself with the aforementioned views expressed by certain Asian nations and proposed that passengers should be allowed to recover for mental injuries that "resulted from" bodily injuries. *See id.* at 141. Similarly, Egypt once again suggested that the new Convention should limit liability for mental injuries by allowing passengers to recover for such injuries where they were "associated with and resulted from ... bodily injur[ies]." *See id.* The Indian delegate also expressed similar sentiments. He argued that "a situation did not exist [as of yet] to introduce the new concept of mental injury independent of bodily injury, as there was no way it could be measured or quantified." *Id.* at 142. According to the Indian delegate, "the only injury that could be recognized at present was bodily injury, and mental injury would necessarily have to be an *outcome* of that bodily injury." *Id.* (emphasis added). Ultimately, delegates who served on the Friends of the Chairman working group continued to differ over the proper scope of the liability provision. *See id.* at 175–76.

This is not an exhaustive list of the many positions advanced by various delegates over the course of the Montreal Conference as to the issue of liability for mental injuries. However, these positions represent a sampling of the diverse, and often divergent, views expressed by the many delegates who attended the Conference, whether they were Friends of the

Chairman or general delegates who sat together as a Commission of the Whole to negotiate the new Convention. By the time certain delegates signed the new Convention on May 28, 1999, "[e]very side of this issue [had] found a voice at the Montreal [C]onference." *Katsuko Hosaka*, 305 F.3d at 1001.

In essence, despite the Ehrlichs' suggestions to the contrary, the history of the negotiations that produced the Montreal Convention demonstrate that the Montreal Conference delegates did not share a common understanding when it came to the subject of liability for mental injuries. Indeed, we note that the Montreal Conference delegates eventually accommodated the different positions on this subject by adopting a so-called "consensus package" as part of which they did little more than adhere to "the concept of death or bodily injury ... contained in the Warsaw Convention." *See Montreal Conference Minutes, supra*, at 201. They did so by ultimately approving a liability provision in the new Montreal Convention that provides, much like Article 17 of the Warsaw Convention, that a "carrier is liable for damage sustained in case of death or bodily injury." Montreal Convention, art. 17(1).[18]

Not only did the divergent opinions of the delegates fall short of a consensus about the *precise* scope of liability for mental injuries, the opinions recorded in the minutes of the Conference were almost exclusively directed at the scope of the new Montreal Convention's liability provision. The dearth of statements opining on the scope of the Warsaw Convention is understandable; the delegates attended the Conference not to proffer opinions about the previous Convention but to negotiate a new, modernized Convention that they hoped would henceforth govern the transportation of persons, baggage, and goods by air. As Dr. Rattray explained, "in coming to [an] accommodation" with respect to the "definition of [an] 'injury' " under the new Convention, the drafting changes that had taken place as the text of that Convention developed "were not intended to interfere with the jurisprudence under the 'Warsaw System' of liability." *Montreal Conference Minutes, supra*, at 201. Since the vast majority of the delegates exclusively spoke about the intended scope of the Montreal Convention, their opinions offer no insight into how their respective legal systems construe the scope of Article 17 of the Warsaw Convention. In short, "the drafting history [of the Montreal Convention] does not," by and large, "paint a coherent picture of the parties' understanding of the Warsaw Convention." *Katsuko Hosaka*, 305 F.3d at 1001.

We do not suggest, however, that no delegates made statements at the Montreal Conference from which their post-ratification understandings of liability for mental injuries under the Warsaw Convention can be inferred. Nonetheless, such statements were few and far between; moreover, for the reasons that follow, we ultimately find them to be of little assistance.

2. *Germany and France*

When Sweden and Norway first suggested the addition of the words "or mental" to the Montreal Convention's liability provision, the German delegate opposed

---

18. Despite this observation, we offer no opinion as to whether, or under what circumstances, carriers may be held liable for mental injuries under Article 17(1) of the Montreal Convention. We need not decide that issue because this appeal is governed by the text of the Warsaw Convention and the specific expectations of the contracting parties to that treaty.

that proposal. *See Montreal Conference Minutes, supra,* at 68. He did not premise his opposition on a disagreement about whether passengers should be permitted to recover for their mental injuries; instead, he argued that only the English text of the new Convention "needed to be amended in order to cover both" mental and bodily injuries since, *inter alia,* the French words "lésion corporelle" encompassed mental injuries. *Id.* Although the French delegate supported the Swedish–Norwegian proposal, he "confirmed that," according to his understanding, " 'lésion corporelle' did indeed cover both physical and mental injury" and that "there was always coverage of the problem as a whole." *Id.; see also id.* at 74 (Spanish delegate opined that "the French term for 'bodily injury' would be considered broad enough to include mental injury."). *Cf. id.* at 69 (Saudia Arabian delegate noted "that the Arabic text for 'bodily injury' could be interpreted as meaning both mental and physical injury."); *id.* at 115 (Syrian delegate explained that, under his nation's jurisprudence, "a bodily injury encompassed [a] mental injury.").

The views expressed by these delegates appear to suggest that their nations might construe Article 17 as if it allowed a passenger to hold a carrier liable for a mental injury, irrespective of whether it accompanied a physical injury, because they interpret the words "lésion corporelle" (or at least the concept of "bodily injury") to refer both to physical and mental injuries. However, whatever deference we may sometimes owe to the opinions of sister signatories, we may not defer to such an understanding of Article 17. The Supreme Court of the United States has held that "lésion corporelle" refers to bodily injuries alone and that an air carrier cannot be held liable under Article 17 for purely mental injuries. *See Floyd,* 499 U.S. at 542, 552, 111 S.Ct. 1489. We are bound to

follow such precedent unless and until the Supreme Court itself overrules *Floyd. See Perez v. Greiner,* 296 F.3d 123, 125 n. 4 (2d Cir.2002). In the absence of a statement from these delegates that could be construed to define the scope of the Warsaw Convention through something more than a contradictory interpretation of the words "lésion corporelle," the opinions of such delegates at the Montreal Conference are of little relevance to the issue before us. Under the circumstances, we have no means of ascertaining from the minutes of the Conference whether their nations would construe Article 17 of the Warsaw Convention to permit liability for mental injuries that were not caused by bodily injuries if they adhered to an interpretation of "lésion corporelle" consistent with *Floyd.*

### 3. *Egypt and The United Kingdom*

The delegates from Egypt and the United Kingdom, like their counterparts from Germany and France, expressed certain opinions that arguably could be construed as references to their nations' post-ratification understandings of Article 17 of the Warsaw Convention. Both delegates were members of the Friends of the Chairman working group. Although certain members of that group, including the United Kingdom's delegate, pushed for a provision in the new Montreal Convention that would have extended a carrier's liability to purely mental injuries, other delegates were more amenable to a liability provision that only allowed passengers to recover for mental injuries "associated" with bodily injuries. As we mentioned before, most delegates at the Montreal Conference, including the members of the Friends of the Chairman working group, exclusively focused their discussions about liability on the new Convention's provision and offered no opinions about their understanding of

the Warsaw Convention. However, when the delegates from the United Kingdom and Egypt discussed liability for mental injuries "associated" with bodily injuries, they briefly made statements that could be read as allusions to the reach of the Warsaw Convention.

The Egyptian delegate explained that "mental injury associated with bodily injury was covered under the term 'bodily injury' under the interpretation of that term given by the Egyptian courts." *Montreal Conference Minutes, supra,* at 112. Although he did not specify whether he had been referring to the Egyptian courts' interpretation of the Warsaw Convention, the Egyptian delegate's statements could be read as a commentary on the scope of that treaty. The delegate from the United Kingdom expressed a similar position. When that delegate "stressed the need" for a broad liability provision in the Montreal Convention, he explained that mental injuries "associated" with bodily injuries "could" already "be recoverable" on the "basis of recent cases." *Id.* at 113. Although he also failed to specify whether he was discussing the current state of Warsaw Convention jurisprudence in the United Kingdom, his statements can plausibly be construed as a reference to the injuries for which carriers could be held liable under that treaty.

Under the circumstances, the opinions of these two delegates provide us with little information about how their respective legal systems construe Article 17 of the Warsaw Convention. Their use of the phrase "mental injury associated with bodily injury," does not, without more, unambiguously refer to mental injuries with no causal connection to bodily injuries. The word "associated" is susceptible to several reasonable interpretations. On the one hand, the word can mean "closely related" or "closely connected, joined, or united." *See Webster's Third New International Dictionary Of The English Language Unabridged* 132 (1971). On the other hand, the word also can mean "to keep company with" (*i.e.,* to accompany). *See id.*

The short statements made by the delegates from Egypt and the United Kingdom on May 17, 1999, wherein they suggested that the Warsaw Convention liability regime allows passengers to recover for their mental injuries if they are "associated" with bodily injuries, do not hint at which of the two foregoing meanings of the word "associated" should be ascribed to those statements. If the delegates were suggesting that passengers could recover for their mental injuries where they were closely connected or closely related to a bodily injury, then the delegates' opinions appear to indicate that their respective courts require a causal connection between mental and bodily injuries before permitting recovery for the former under the Warsaw Convention. *Cf. Westinghouse Credit Corp. v. Bader & Dufty,* 627 F.2d 221, 223 (10th Cir.1980) (citing *Vincent v. Moench,* 473 F.2d 430, 434–35 (10th Cir. 1973)) (noting that a causal connection exists between an action and an injury if the two are directly associated with one another). If, on the other hand, the delegates meant to suggest that passengers could recover for their mental injuries where they merely accompanied bodily injuries, then the delegates' opinions appear to indicate that their courts require no such causal connection before recovery for mental injuries would be allowed.[19] Since we have

19. The Ehrlichs, citing statements made by the delegate from Mauritius, argue that the words "associated with" should not be equated with a causal connection. They point out that the delegate from Mauritius employed that phrase in the disjunctive while responding to the Swedish–Norwegian proposal on the third day of the Montreal Conference.

no conclusive means of resolving the critical ambiguities inherent in the delegates' statements, we do not afford them deference to the extent that they represent Egypt's and the United Kingdom's post-ratification understanding of Article 17 of the Warsaw Convention.[20]

The statements of the United Kingdom's delegate are also troubling for one additional reason. If that delegate meant to suggest that courts in the United Kingdom allow passengers to recover for their mental injuries under the Warsaw Convention regardless of whether they were caused by bodily injuries, his characterization of the law appears to conflict with the contrary statements of Lord Steyn and Lord Hobhouse of Woodborough in *Morris* and *King*. We do not suggest that the British delegate may have misstated the law as it existed at the time of the Montreal Confer-

Their arguments, however, are not persuasive. First, the meaning that specific delegate may have ascribed to the words "associated with" does not clarify what different delegates, namely those from Egypt and the United Kingdom, meant to suggest when they used those words at the first session of the Friends of the Chairman group on May 17, 1999. Second, the Ehrlichs take the statements they cite to out of context. The delegate from Mauritius was not construing the scope of a carrier's liability under Article 17 of the Warsaw Convention. To the contrary, when he made those statements, he was exclusively expressing a position on the appropriate scope of the Montreal Convention's liability provision. *See Montreal Conference Minutes, supra,* at 71. In that context, he "suggested that confirmation be given that the term 'bodily injury' " in Article 16 of the draft Convention "did not exclude mental injury which resulted from, or was associated with, bodily injury." *Id.* Given his focus on how the words "bodily injury" should be defined in the Montreal Convention, it is unclear whether the delegate from Mauritius also believed that the Warsaw Convention allowed passengers to recover for mental injuries "which resulted from, or [were] associated with, bodily injur[ies]," whatever that phrase may mean.

**20.** We note that, toward the end of the Montreal Conference, Dr. Rattray indicated to the Conference delegates that "all [of the Friends of the Chairman] had recognized that under the concept of bodily injury there were circumstances in which mental injury which was associated with bodily injury would indeed be recoverable and damages paid therefor." *See Montreal Conference Minutes, supra,* at 201. However, we are unable to glean any guidance from this vague statement.

First, Dr. Rattray did not explain whether he meant that the Friends were construing the scope of the words "bodily injury" for the purposes of the Montreal Convention alone or whether they were also opining about the proper construction of those words in the Warsaw Convention. We have reviewed the minutes for the sessions attended by the Friends and see no evidence of a consensus among them about the scope of liability for mental injuries under the Warsaw Convention. The vast majority of the Friends did not offer their views with respect to liability under that treaty. Rather, most of them exclusively put forth opinions about the appropriate scope of liability under the new Convention.

Second, even if we assume, for the sake of argument, that all of the Friends "recognized that" mental injuries "associated with" bodily injuries were "recoverable" under the Warsaw Convention, Dr. Rattray's statement to that supposed effect still suffers from the same ambiguities inherent in the statements of the delegates from Egypt and the United Kingdom. Since nothing in the minutes of the Montreal Conference conclusively clarifies the statement Dr. Rattray made on May 25, 1999, we are unable to confirm whether, on that date, he was indicating: (a) that many of the Friends understood the words employed by the Warsaw Convention to subject a carrier to liability for mental injuries only if they arose from or were the result of a bodily injury (a position, we note, which some of the Friends pressed at the Montreal Conference), or (b) whether those words would subject a carrier to liability for mental injuries whenever they accompanied a bodily injury. In sum, Dr. Rattray's ambiguous statement on that date offers us no specific insight into how the Friends construed Article 17 of the Warsaw Convention (assuming in fact they were doing so).

ence in May 1999. The House of Lords did not issue its decision in *Morris* and *King* until 2002. However, because the delegate's characterization of the law in the United Kingdom may well be an inaccurate description of how Law Lords in the House of Lords construe Article 17 in light of *Morris* and *King*, that consideration further counsels in favor of affording his opinion at the Montreal Conference no deference.

### 4. *The United States*

The delegate from the United States also made several statements that implicate the Warsaw Convention. When Dr. Rattray asked, during the first meeting of the Friends of the Chairman group, whether "the concept of bodily injury and any mental injury resulting therefrom" would "accommodate in wide measure the kind of understanding which could be reached" on the subject of liability for mental injuries, the American delegate expressed reservations about the use of such language. *Montreal Conference Minutes, supra*, at 111–12. He explained that the term " 'bodily injury' was already interpreted in [American courts] as including mental injury that accompanied or was associated with bodily injury." *Id.* at 112. According to the delegate from the United States, "[t]he general prevailing attitude in the [c]ourts interpreting the Warsaw Convention in the United States was that mental injury associated with bodily injury had generally been recoverable in cases coming under the Warsaw Convention." *Id.*

For those reasons, the American delegate suggested that references to "mental injury resulting from bodily injury . . . might, in fact, be a step backwards from where the state of American jurisprudence on mental injury was to begin with." *Id.* Hence, he took the position that, if the delegates intended to adopt the language

proposed by Dr. Rattray, "the United States would prefer to leave bodily injury alone and establish legislative history to the effect that no intention had been manifested by having considered mental injury to change the existing jurisprudence on what was or what was not included in the term 'bodily injury.' " *Id.*

The Ehrlichs contend that the American delegate's statements support their construction of Article 17 and argue that we must defer to the delegate's so-called "interpretation" of that provision. However, the United States, appearing as *amicus curiae* in the instant appeal, takes the position that its delegate at the Montreal Conference was merely describing the existing jurisprudence on the issue of liability for mental injuries under the Warsaw Convention at that time. The government now officially endorses an interpretation of Article 17 that favors the construction of that provision advanced by American Eagle and urges us to accord that interpretation "great weight."

 "Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty." *Tsui Yuan Tseng*, 525 U.S. at 168, 119 S.Ct. 662. Under the circumstances, we must determine whether the Executive Branch has advanced two different interpretations of Article 17 and, if so, "what position of" the Executive Branch "this [C]ourt ought to defer to." *Lewis v. Grinker*, 965 F.2d 1206, 1220 (2d Cir.1992).

We have reviewed the American delegate's statements at the Montreal Conference and agree with the government that they merely described his views of Warsaw Convention jurisprudence in the United States as of May 1999. Although the American delegate had hoped that the new Montreal Convention would allow passengers to recover for mental injuries even if the passengers did not suffer "ac-

companying physical injury," *see Montreal Conference Minutes, supra,* at 44, he did not endorse any particular interpretation of the older Warsaw Convention over the course of the Conference. His statements at the first session of the Friends of the Chairman working group did little more than outline how he believed courts in the United States interpreted the Warsaw Convention. *See id.* at 112. In other words, he did not opine on the government's interpretation of the Warsaw Convention and his statements did not represent the Executive Branch's post-ratification understanding of Article 17; instead, he described the "state of American jurisprudence on mental injury" and sought to ensure that the new Montreal Convention's liability provision would not "change" or otherwise limit "the existing jurisprudence." *See id.* Accordingly, the interpretation of Article 17 proffered by the government in the appeal before us is not inconsistent with any position taken by its delegate at the Conference since the delegate did not interpret Article 17 on the government's behalf during that proceeding.

Moreover, even if we assumed for the sake of argument that the American delegate's statements at the Friends of the Chairman session did constitute our government's initial interpretation of Article 17, we would not defer to his understanding of that provision. Although we owe respect to the views of the Executive Branch in regard to the meaning of an international treaty, such deference is "ordinarily due" only to the *"reasonable views"* of the government. *See Tsui Yuan Tseng,* 525 U.S. at 168, 119 S.Ct. 662 (emphasis added). The opinion expressed by the American delegate about Warsaw Convention jurisprudence in the United States was not a "reasonable view" to which we must defer.

At the Conference, the American delegate opined that references to mental injuries "resulting from" bodily injuries "might" represent a "step backwards" because "[t]he general prevailing attitude in [c]ourts interpreting the Warsaw Convention in the United States was that mental injury associated with bodily injury had generally been recoverable." *Montreal Conference Minutes, supra,* at 112. By making these statements, the American delegate appeared to suggest that, as of May 1999, the majority of courts in the United States construed Article 17 in a fashion that allowed passengers to recover for a mental injury whenever they sustained a physical injury, regardless of whether the mental injury resulted from a bodily injury. That understanding of applicable case law is incorrect.

Most district courts that had considered the issue at the time of the Montreal Conference, as well as the New York Court of Appeals, had concluded that passengers could hold carriers liable for mental injuries under Article 17 only to the extent that such injuries were caused by physical injuries. *See Longo,* 1996 WL 866124, at *2; *Wencelius,* 1996 WL 866122, at *1; *Jack,* 854 F.Supp. at 668; *Ospina,* 778 F.Supp. at 636–37; *Burnett,* 368 F.Supp. at 1158; *Rosman,* 34 N.Y.2d at 399–400, 358 N.Y.S.2d at 109–110, 314 N.E.2d at 856–57. By May 1999, only one district court had read Article 17 in a fashion consistent with the American delegate's expansive characterization of Warsaw Convention jurisprudence. *See Roselawn,* 954 F.Supp. at 179. Because the American delegate erred in his description of the "prevailing" interpretation of Article 17 in the United States, his statements, to the extent they supposedly represent the Executive Branch's interpretation of that provision, are not reasonable and are not entitled to any deference. *Cf. Chan,* 490 U.S. at 133–34, 109 S.Ct. 1676.

Because we conclude that the American delegate's statements at the Montreal Conference did not constitute an interpretation of the Warsaw Convention and would reject them as an unreasonable view if they did, we must determine what deference, if any, to accord the interpretation of Article 17 that the government supports in this appeal. In its *amicus* brief, the government advances an interpretation of Article 17 that "allows for recovery of damages arising out of a bodily injury sustained in an accident including any mental injuries that may arise from that bodily injury, such as pain and suffering." "Although not conclusive, the meaning attributed to treaty provisions by the [g]overnment ... is entitled to great weight." *Sumitomo Shoji America v. Avagliano,* 457 U.S. 176, 184–85, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982). The government's interpretation of Article 17 is faithful to the Warsaw Convention's text, negotiating history, purposes, and the judicial decisions of sister Convention signatories; as such, we ascribe "great weight" to the government's views concerning the meaning of that provision. *Cf. Tsui Yuan Tseng,* 525 U.S. at 168–69, 119 S.Ct. 662. These views further persuade us that mental injuries are recoverable under Article 17 only to the extent that they have been caused by bodily injuries.

### H. *Summary*

We have reviewed, *inter alia,* the text of the Warsaw Convention, the negotiations that led to the adoption of that treaty, the goals its provisions aim to address, French law, the opinions (judicial and otherwise) of our sister Convention signatories, and the meaning attributed to Article 17 of the Convention by our Executive Branch. Our exhaustive examination of these sources leads us to conclude that a carrier may be held liable under Article 17 for mental injuries only if they are caused by bodily injuries.

### IV. *Zicherman v. Korean Air Lines*

In a last ditch effort to circumvent the limitations on liability enumerated in Article 17, the Ehrlichs contend that, in accordance with the Supreme Court's decision in *Zicherman v. Korean Air Lines Co., Ltd.,* the laws of either New York or Maryland, rather than Article 17, govern whether they may recover damages for their alleged mental injuries. The district court did not find this argument to be persuasive. *See Ehrlich,* 2002 U.S. Dist. LEXIS 21419, at *9–*10. Neither do we.

In *Zicherman,* the Court held that "in an action brought under Article 17, the law of the [Warsaw] Convention does not affect the substantive questions of who may bring suit and what they may be compensated for. Those questions are to be answered by the domestic law selected by the courts of the contracting states." 516 U.S. at 225, 116 S.Ct. 629. As the Court explained, Article 17 "provide[s] nothing more than a pass-through, authorizing us to apply the law that would govern in the absence of the Warsaw Convention." *Id.* at 229, 116 S.Ct. 629.

In the wake of *Zicherman,* the Court has clarified "that the Convention addresses the question whether there is airline liability *vel non.*" *Tsui Yuan Tseng,* 525 U.S. at 170, 119 S.Ct. 662. According to the Court, "[t]he *Zicherman* case itself involved auxiliary issues: who may seek recovery ... and for what harms they may be compensated." *Id.* In short, the "Court in *Zicherman* determined that [the] Warsaw [Convention] drafters intended to resolve *whether there is liability,* but to leave to domestic law (the local law identified by the forum under its choice-of-law rules or approaches) determination of the compensatory damages available to the suitor." *Id.*

"Article 17 of the Warsaw Convention sets forth conditions under which

an international air carrier can be held liable for injuries to passengers." *Floyd,* 499 U.S. at 532–33, 111 S.Ct. 1489; *see also Tsui Yuan Tseng,* 525 U.S. at 162, 119 S.Ct. 662 ("Article 17 establishes the conditions of liability for personal injury to passengers."). Among other such conditions, the Convention provides that a carrier is liable only for "damage *sustained in the event of* . . . bodily injury" (*i.e.* "dommage *survenu en cas de* . . . *lésion corporelle* "). 49 Stat. at 3005, 3018 (emphasis added). In this appeal, we have determined that mental injuries that are not caused by bodily injuries are not "damage sustained in the event of . . . bodily injury." The district court found no evidence of a "causal connection between [the Ehrlichs'] alleged bodily injuries and their mental suffering," *Ehrlich,* 2002 U.S. Dist. LEXIS 21419, at *11, and the appellants do not challenge that conclusion on appeal. In the absence of that causal connection, the Ehrlichs cannot demonstrate that they have satisfied the conditions of Article 17 such that American Eagle may he held liable for their mental injuries.[21] Because the carrier is not liable for those injuries, there is no reason to turn to the laws of either New York or Maryland to determine whether compensatory damages for their mental injuries are available to the Ehrlichs.

## CONCLUSION

For the foregoing reasons, we affirm the district court's grant of partial summary judgment.

---

**21.** In sharp contrast, in *Zicherman,* the loss-of-society claims brought by the plaintiffs in the aftermath of their relative's death could not have run afoul of this condition of liability. As the district court correctly explained, the plaintiffs' damages in *Zicherman* "clearly arose out of the death or bodily injury of their deceased relative." *Ehrlich,* 2002 U.S. Dist. LEXIS 21419, at *10.